In the

# United States Court of Appeals

### For the Seventh Circuit

————————

No. 07-1545

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RAFAEL ZARAGOZA,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. 05 CR 19—**Sarah Evans Barker**, *Judge.*

————————

ARGUED MAY 8, 2008—DECIDED SEPTEMBER 11, 2008

————————

Before BAUER, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* Rafael Zaragoza was charged, along with ten co-defendants, with conspiring to possess methamphetamine ("meth") with the intent to distribute it. Following a four-day trial at which a number of Zaragoza's co-defendants testified against him, the jury returned a verdict of guilty, and he was eventually sentenced to a term of 300 months' imprisonment. Zaragoza appeals. While he does not deny dealing meth,

he argues that there was insufficient evidence to support the jury's finding that he engaged in a conspiracy with his co-defendants to do so. Zaragoza also asserts that he had difficulty understanding the proceedings against him, and that his due process rights were violated when the district court failed to make an inquiry regarding this fact after being alerted to it. We affirm.

I.

The following facts were presented to the jury at Zaragoza's trial. On February 23, 2003, an Indiana State Trooper pulled over Zaragoza's co-defendant Katrina Eschman for driving at night without her headlights. The trooper discovered marijuana, cocaine, meth, heroin, and $3,463.61 in cash in Eschman's car. Eschman also had an address book containing the phone number for someone named "Watchie," later identified by numerous witnesses as Zaragoza. Eschman said that Zaragoza was her drug supplier. She agreed to cooperate and placed a call to him that was monitored by police, and arranged for him to deliver to her some cocaine and meth. While Zaragoza was traveling towards Eschman's house shortly after she placed this call, he was stopped by authorities. Although he was not found to be in possession of any drugs, the arresting officer called the phone number Eschman had said belonged to her supplier, and Zaragoza's cell phone rang. Officers then searched Zaragoza's house and discovered $11,500 in cash and a handgun. While state charges were brought against Zaragoza as a result of these events, those charges were subsequently dismissed without prejudice.

On October 16, 2004, co-defendant Brijido Ortiz was stopped while driving through Nebraska after a state trooper determined that the vehicle he was driving had been reported stolen in Indiana and possibly contained a missing juvenile. Ortiz was in fact traveling with the juvenile, who was eight months pregnant, and upon searching the car officers found a bag containing approximately 436 grams of meth. Ortiz was arrested, and he eventually pleaded guilty to federal charges filed against him relating to this arrest in Nebraska. Ortiz testified that he began working as a drug courier for Zaragoza in late 2003 or early 2004. He would travel to California with money Zaragoza provided, purchase meth from Zaragoza's brother, Caesar, and then carry the drugs back to Indiana. Zaragoza paid Ortiz $1,000 to make these trips, and he was on the return portion of one of these trips when he was arrested in Nebraska. Ortiz estimated that, prior to his arrest, he had traveled to California for Zaragoza ten times and returned with a total of at least 20 pounds of meth.

Once he returned to Indiana, Ortiz would distribute the meth for Zaragoza to lower-level dealers, and Zaragoza paid him $300 a week to make these distributions. Ortiz testified specifically that he delivered meth to Zaragoza's co-defendants Wendell Mason, Michelle Ballard, and Timothy Samples. When Ortiz collected money from these individuals, he stated that he would keep it until "it added up," at which point he passed it on to Zaragoza. Another co-defendant, Garry Lowery, verified that Zaragoza was selling meth to Mason. Lowery testified that he began purchasing meth for personal use from Mason in late 2003 or early 2004. During this period, Mason told

Lowery that he bought the meth he sold Lowery from Zaragoza.

On October 22, 2004, police initiated a traffic stop of co-defendant Christopher Robertson during which he threw a bag containing meth from his car. The officers had reason to believe that there was more meth in Robertson's residence, and they obtained his consent to search the property. The search of Robertson's property yielded multiple baggies, balloons, and other containers filled with meth. Robertson, who pleaded guilty to the charges filed against him in this case, testified that he sold meth out of his residence, and that he purchased that meth from Zaragoza. Robertson testified at trial that for the nine months leading up to his arrest, he purchased meth from Zaragoza anywhere from twice a day up to every three days in amounts ranging from one to ten ounces. Zaragoza "fronted" Robertson the meth, meaning Robertson was given the meth without having to pay first, and he would then pay Zaragoza once the meth was sold.

When Robertson eventually paid Zaragoza for the drugs, he would wrap the cash in rubber bands in increments that were easy to handle and count. Robertson's testimony regarding the method by which Zaragoza received payment was confirmed by the testimony of an officer who had pulled Zaragoza over for speeding on September 6, 2004. Upon a search of Zaragoza's vehicle, the officer discovered five bundles of bills bound with rubber bands, each bundle containing ten $100 dollar bills. Zaragoza also had $2,700 on his person. While there was no testimony regarding whether the $2,700 was wrapped

in a particular way, Robertson testified that he had paid Zaragoza that amount of money on that day. Robertson described his relationship with Zaragoza as solely a business relationship. Robertson stated that he was also aware that Zaragoza was selling significant quantities of meth to Mason and Samples.

On December 14, 2004, police executed a search warrant at the home of Ballard and her boyfriend and co-defendant, Antonio Montes.[1] Upon searching the residence, police discovered meth, digital scales, and $300 in Ballard's purse. Ballard, who also pleaded guilty to the charges filed against her in this case, testified that Montes acted in a courier capacity for Zaragoza similar to Ortiz, traveling to California and returning with meth. Ballard sold meth out of her residence supplied to her by Montes, Ortiz, or Zaragoza and had been engaged in these sales with Montes since mid-2003. Montes paid Zaragoza for the meth he and Ballard sold from their residence, at one time paying him as much as $10,000.

Based upon these incidents, and a number of others not relevant here, the government initiated this case against Zaragoza by filing a criminal complaint on Septem-

---

[1] While we use "Ballard" to refer to Michelle Ballard, we note that her father, Tony Ballard, is a co-defendant in this case. He was arrested on November 4, 2004, for possession of an ounce of meth he bought from Zaragoza. Tony Ballard was eventually charged with possession of meth with intent to distribute, to which he pleaded guilty. His other daughter, Patricia, was the pregnant juvenile traveling with Ortiz when he was arrested in Nebraska.

ber 13, 2005. A superseding indictment was returned on October 13, 2005, against Zaragoza and ten codefendants charging them with conspiring to possess with intent to distribute 500 or more grams of meth in violation of 21 U.S.C. §§ 841(a)(1) and 846. Zaragoza's codefendants pleaded guilty, and the charges against Zaragoza were tried before a jury commencing on October 16, 2006. Because he was a Spanish speaker, Zaragoza was assisted during the trial by Spanish interpreters. Laura Garcia-Hein, a federally certified Spanish language interpreter, was present on the first day of trial. Garcia-Hein was assisted during jury selection by Christina Cartwright, who was not federally certified. Before opening statements, Cartwright was replaced by Claudia Samulowitz, a federally certified interpreter. Garcia-Hein and Samulowitz continued translation on the second and third days of trial. On the fourth and final day of trial, Samulowitz and Margaret Redd, also a federally certified interpreter, translated.

On the final day of trial, Zaragoza's attorney alerted the court that Zaragoza was "having a problem with the interpreter not interpreting as he believes that she should interpret." Zaragoza's attorney further informed the court that Zaragoza had raised the issue with her the day before, and stated that Zaragoza was "not one hundred percent understanding the interpretation. It can be an issue of dialect." The district court noted on the record that the interpreters were certified, and that Zaragoza appeared to be receiving clarification where necessary because the court had observed him conversing and exchanging notes with the interpreters. The district court further noted that Zaragoza had conversed with his

attorney in English during trial, and that numerous witnesses had testified that they communicated with Zaragoza in English. Later that day, after the trial concluded, the jury returned a verdict of guilty.

The court proceeded to sentencing on February 21, 2007. Zaragoza's counsel requested that the court continue the hearing because the interpreter was not certified, and because she spoke a different Spanish dialect than Zaragoza. The district court denied Zaragoza's request, noting that it had ruled on a similar request at trial, and that there was no evidence suggesting that the current interpreter was deficient. The court proceeded with sentencing, and on February 27, 2007, Zaragoza was sentenced to 300 months' imprisonment, followed by ten years' supervised release. Zaragoza appeals his conviction.

## II.

Zaragoza presents two issues on appeal.[2] First, he argues that the evidence was insufficient to support a finding

---

[2] In addition to the two arguments considered here, Zaragoza raised an ineffective assistance of counsel claim arguing that he was prejudiced by his attorney's delay in raising his inability to understand the interpreters. However, he withdrew this claim at oral argument. *See United States v. Williams*, 272 F.3d 845, 854 (7th Cir. 2001) ("We believe these [ineffective assistance of counsel] claims are best brought in a collateral proceeding where the record can be fully developed, and not on direct appeal when most of the pertinent information is not yet in the record.").

that he engaged in a conspiracy to possess meth with the intent to distribute it. Second, Zaragoza contends that he was denied due process because the district court failed to make the required inquiry after being informed that he was having difficulty understanding the proceedings based on a language barrier. In reviewing the sufficiency of the evidence underlying a criminal conviction, "we ask only if, after viewing all of the evidence in a light most favorable to the government, and drawing all reasonable inferences therefrom, a rational trier of fact could not have found the essential elements of the crime, beyond a reasonable doubt." *United States v. Wantuch*, 525 F.3d 505, 519 (7th Cir. 2008). This presents the defendant making such an argument with "a daunting task." *Id.*

In making the argument, Zaragoza does not deny that he and his codefendants were involved in selling meth. Rather, he argues that their dealings involved no agreement regarding a separate criminal object other than their immediate "buy-sell" transactions. "The essence of conspiracy is, of course, an agreement to commit a crime." *United States v. Thomas*, 284 F.3d 746, 751 (7th Cir. 2002). However,

> [w]hen the sale of some commodity, such as illegal drugs, is the substantive crime, the sale agreement itself cannot be the conspiracy, for it has no separate criminal object. What is required in such a case is an agreement to commit some other crime beyond the crime constituted by the [sale] agreement itself.

*Id.* at 751-52. In *Thomas*, in addition to the initial sale, the separate crime was the further distribution of the sizable

amount of crack the purchaser bought and then sold in smaller quantities to her own customers. Factors to be considered in weighing whether more than a mere buyer-seller agreement existed include "the length of the affiliation, the established method of payment, standardized transactions, and a level of mutual trust." *United States v. Fuller*, 532 F.3d 656, 662 (7th Cir. 2008). "If enough of these factors 'are present and point to a concrete, interlocking interest beyond individual buy-sell transactions,' we 'will not disturb the fact-finders [sic] inference that at some point, the buyer-seller relationship developed into a cooperative venture.'" *Id.* (citation omitted).

The evidence presented at Zaragoza's trial was sufficient to establish the sort of "interlocking interests" indicative of a conspiracy to distribute meth. First, there was testimony that Zaragoza depended on Ortiz and Montes to travel to California to obtain the meth, and then distribute it to the next level of dealers in Indiana. An even stronger example of interdependence among the codefendants was the fact that Zaragoza would often not get paid for the meth he sold to the next level of distributors until they made their sales. Ortiz and Robertson testified that they held on to the money they received from meth sales until it "added up," at which point they paid Zaragoza. While Ballard's testimony on this point was not as clear as that of Ortiz and Robertson, an inference can be drawn that she and Montes were also being fronted meth, and then making payments once they sold enough to pay back Zaragoza. Zaragoza's dependence on the success of distributors like Robertson, Ballard, and Montes was sufficient evidence for the jury to conclude

that the codefendants had agreed to participation in a meth distribution conspiracy, and not merely a series of buy-sell agreements. *See United States v. Torres-Ramirez*, 213 F.3d 978, 982 (7th Cir. 2000) ("A dealer who 'fronts' drugs to his customer depends for payment on the success of the resale venture, making it possible to infer that the dealer has agreed to participate in it: the dealer becomes at least a debt investor in the redistribution venture, if not an equity investor.").

In addition to these fronting transactions, there was a regularity of payments indicating an arrangement more substantial than mere buy-sell agreements. First, Ortiz testified that Zaragoza paid him regular amounts for his efforts—$1,000 for trips to California, and $300 per week for distributing the meth in Indiana. Next, Robertson testified that in paying Zaragoza, he wrapped the bills in uniform, easily counted increments. And when Zaragoza was arrested on September 6, 2004, police found $5,000 in hundred dollar bills, wrapped as described by Robertson, in the trunk of his car. The regular form of payment made to Zaragoza, as well as the regular salary-like amounts he paid Ortiz for his duties are the kind of "standardized transactions" upon which the jury could have relied in finding that Zaragoza engaged in a conspiracy. *See Fuller*, 532 F.3d at 662.

Next, the testimony at trial showed that Zaragoza sold meth to his codefendants over a considerable period of time. Eschman's arrest and the subsequent discovery of cash and a handgun at Zaragoza's house support a finding that Zaragoza was involved in meth distribution

at least since February 2003. Robertson testified that he bought meth from Zaragoza regularly during the nine months prior to his arrest in October 2004. Ortiz was also arrested in October 2004, and testified that he had been acting as a courier for Zaragoza since late 2003 or early 2004. Finally, Ballard was arrested in December 2004, and she testified that she and Montes had been dealing meth sold to them by Zaragoza since the middle of 2003. Dealings of this duration are similar to or exceed periods we have previously found sufficient to indicate the existence of a conspiracy, and they supported such a finding here. *See, e.g., Fuller*, 532 F.3d at 663 (noting that a five-month affiliation between a cocaine dealer and buyer supported the jury's finding); *United States v. Gee*, 226 F.3d 885, 894 (7th Cir. 2000) (concluding that there was no basis to reverse the jury's finding where standardized transactions occurred over thirteen months).

The fronting of meth by Zaragoza, the standardized manner in which he made and received payment, as well as the duration of the codefendants' relationships indicated that the parties had gone beyond engaging in mere buy-sell transactions. Therefore, the evidence supported a finding that Zaragoza conspired with his codefendants to engage in a meth distribution operation. Accordingly, we find no basis upon which to disturb the jury's finding.

Regarding Zaragoza's due process argument, we note that under the Court Interpreters Act, 28 U.S.C. § 1827, a defendant is entitled to the assistance of an interpreter when he "speaks only or primarily a language other than

the English language." 28 U.S.C. § 1827(d)(1)(A). A defendant's entitlement to an interpreter is established by determining whether the defendant "(1) speaks only or primarily a language other than the English language; and (2) this fact inhibits their comprehension of the proceedings or communication with counsel." *United States v. Johnson*, 248 F.3d 655, 661 (7th Cir. 2001). The district court has a duty to evaluate these factors when put on notice as to their relevance, and it should normally undertake such considerations as the "defendant's knowledge of English and the complexity of the proceedings and testimony." *Id.* We review the district court's final determination on the appointment and use of interpreters for abuse of discretion because the district court "is in the best position to evaluate the need for and the performance of interpreters." *United States v. Sandoval*, 347 F.3d 627, 632 (7th Cir. 2003).

Zaragoza argues that the district court abused its discretion because, once presented with the possibility that he was not understanding the proceedings, it failed to make an inquiry into the extent to which his comprehension of the proceedings was compromised. However, while the district court may not have inquired directly of Zaragoza regarding his comprehension, the record shows that the court was sufficiently informed about Zaragoza's level of understanding of the proceedings, based on its observations at trial, to continue with the proceedings. First, the court noted that Zaragoza appeared to be receiving clarification from the interpreters directly. More importantly, the court observed Zaragoza speaking English with his attorney, and numerous witnesses had testified that

during their dealings with Zaragoza, they spoke English. For example, Robertson, Michelle Ballard, and Tony Ballard all testified that they communicated with Zaragoza in English. Officer Joseph Waters, who arrested Zaragoza on September 6, 2004, also testified that he communicated with Zaragoza only in English.

The court was presented with Zaragoza's possible failure to comprehend on the last day of a four-day trial after observing him communicate with the interpreters, communicate with his attorney in English, and after hearing testimony that Zaragoza spoke English in his dealings outside of court. Furthermore, Zaragoza had been assisted at every stage of trial following jury selection by two federally certified interpreters.[3] The district court, therefore, had sufficient information upon which to base its decision to continue with the proceedings without changing the interpreters. Under these circumstances, the court's decision not to make any further inquiry of Zaragoza was not an abuse of discretion.

III.

The jury was presented with sufficient evidence to support a finding that Zaragoza engaged in a conspiracy to distribute meth. Additionally, because the district court

---

[3] Zaragoza's objection to the use of an uncertified interpreter at sentencing is likewise unavailing because, as we have previously noted, the Court Interpreters Act does not require use of a certified interpreter. *See Sandoval*, 347 F.3d at 632.

had sufficient information to make the determination provided for under the Court Interpreters Act, 28 U.S.C. § 1827, its decision not to make further inquiry of Zaragoza was not an abuse of discretion. Accordingly, Zaragoza's conviction is AFFIRMED.