# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-1192, 08-1543, & 08-1694

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT M. HARRIS, DAVID T. MORROW,
and DAMIAN Y. JAMES,

*Defendants-Appellant*s.

Appeals from the United States District Court
for the Southern District of Illinois.
No. 07 CR 40006—**J. Phil Gilbert,** *Judge.*

ARGUED FEBRUARY 19, 2009—DECIDED JUNE 2, 2009

Before FLAUM and WILLIAMS, *Circuit Judges,* and KAPALA,
*District Judge.*[*]

WILLIAMS, *Circuit Judge.* We consider in this case the
appeals of three defendants convicted of conspiring to

[*] The Honorable Frederick J. Kapala of the United States
District Court for the Northern District of Illinois, sitting by
designation.

sell crack cocaine in southern Illinois. Only Damian James challenges his conviction, and we find there was no Speedy Trial Act violation in his case because, after excluding the time attributable to the continuances James himself requested, his trial commenced in a timely fashion. We also conclude that sufficient evidence supported his conviction for conspiring to sell crack cocaine as he pooled his money with others to buy crack that all knew would be resold, was dependent on others for the crack that he resold, and tried on more than one occasion to get another person to join the crew buying crack cocaine from Memphis.

With respect to the defendants' sentences, we affirm James's sentence because the Supreme Court's decision in *Kimbrough v. United States,* 128 S. Ct. 558 (2007), had no impact on his sentence. The district court's decision to sentence him above a mandatory statutory minimum that exceeded the guidelines ranges for crack and powder cocaine offenses was not affected by the crack/powder disparity. Next, the government agrees that Robert Harris should receive a remand in light of *Kimbrough*, and he receives a full resentencing because he preserved his argument before the district court. Finally, we remand David Morrow's case for resentencing as we cannot be assured that the district court considered all of the relevant 18 U.S.C. § 3553(a) factors, including his health problems, when it imposed a 504-month sentence.

## I. BACKGROUND

David Morrow began selling marijuana in the Mt. Vernon, Illinois area in 2002 or 2003. After about a year, he ventured into crack cocaine. He obtained the crack from sources in Memphis and St. Louis. Robert Harris and Damian James also dealt crack cocaine in the Mt. Vernon and nearby areas. To obtain the crack they sold, Morrow, Harris, James, and others pooled their money together to purchase it. Morrow and Harris often made the out of town trips together to purchase the crack, and James came along on occasion too. These trips occurred frequently—at least once every two weeks for about three years, if not more. Sometimes after the two bought crack from the St. Louis source, Morrow and Harris would head to a local mall to meet up with James.

The men who pooled their money together to buy crack resold it separately in southern Illinois. This arrangement went on for several years. During that time, James tried to recruit others to join the team of people purchasing crack from out of state. He tried to convince another drug dealer to join Morrow, James, and Harris in purchasing crack from their source, saying he could get a better price than the one he was getting from his current supplier. The dealer declined, but James, this time with Morrow present, asked the dealer to join the "Memphis crew" again a few weeks later. That attempt also failed.

Multiple witnesses testified that they bought crack from Harris or James. One witness testified that on one occasion when he tried to purchase crack from Harris,

Harris said he was out and would have to wait until Morrow and James returned from Memphis so he would have more crack. Another testified that he started buying crack from James in 2003 and purchased it about twice a week for five or six months. He also said James would give him crack on credit, expecting him to pay James back after he resold the crack. Another testified that he once called Morrow to get crack cocaine, and Morrow said he was out and referred him to Harris instead.

Law enforcement officers arrested James in 2006 after they responded to a call of shots fired and found a rifle in his back seat. James was indicted on January 11, 2007 with two counts of distributing crack cocaine. He made his initial appearance eight days later. A superseding indictment on March 8, 2007 added Morrow, Harris, and two others as defendants, charging them all with participating in a conspiracy to distribute more than 50 grams of crack cocaine. The indictment also added a felon-in-possession charge against James and other charges against the other defendants. Morrow, Harris, and James took their cases to trial. A jury convicted Morrow of conspiring to distribute crack cocaine and maintaining a crack house. He received a sentence of 504 months' imprisonment. After a trial separate from Morrow's, a jury convicted James of conspiring to distribute crack cocaine, possession of a firearm by a felon, and distribution of crack cocaine. That same jury convicted Harris of conspiring to distribute crack cocaine. The district court sentenced James to 295 months' imprisonment and Harris to 235 months. All three appeal.

## II. ANALYSIS

A. James's Appeal

   1.    There was no Speedy Trial Act violation.

James first argues that the district court should have granted the motion he made to dismiss his case with prejudice under the Speedy Trial Act, 18 U.S.C. § 3161. In federal prosecutions, the Speedy Trial Act provides that a defendant's trial must commence within seventy days of the filing date of the information or indictment, or of the defendant's initial appearance, whichever comes later. 18 U.S.C. § 3161(c). James initially appeared on January 19, 2007 and his trial commenced on September 24, 2007, so he maintains that a Speedy Trial Act violation occurred. We review James's challenge de novo. *See United States v. Rollins*, 544 F.3d 820, 829 (7th Cir. 2008).

Although James's trial commenced more than seventy calendar days after his initial appearance, the Speedy Trial Act specifically excludes certain periods of delay from the time within which a trial must begin. 18 U.S.C. § 3161(h) (2008). Two of these exceptions are particularly relevant in our case. First, the Act specifically excludes:

> A reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted.

18 U.S.C. § 3161(h)(6); *see also Rollins*, 544 F.3d at 829 ("An excludable delay of one defendant may be excludable as to all defendants, absent severance."). After James's initial appearance, the grand jury returned a superseding indictment on March 8, 2007 that added additional defen-

dants and charged them, as well as James, with conspiring to sell crack cocaine. Codefendant Harris made his initial appearance on May 1, 2007. Therefore, under § 3161(h)(6), the time from January 19 to May 1 is excluded from the speedy trial computation if it was reasonable, and James makes no argument that the three and one-half month delay until Harris's appearance was unreasonable. *Cf. Rollins*, 544 F.3d at 829 (stating that five and one-half month period until codefendant's initial appearance not unduly long).

Our decision in *United States v. Asubonteng*, 895 F.2d 424, 426 (7th Cir. 1990), does not direct otherwise. We did not exclude time in *Asubonteng* between the initial and superseding indictment from the speedy trial computation, but we did not do so because that case involved only a single defendant. Here, though, because the superseding indictment added additional defendants, the relevant document that marks the beginning of the speedy trial calculation is the superseding indictment, not the initial indictment. *See Henderson v. United States*, 476 U.S. 321, 323 n.2 (1986); *see also United States v. Farmer*, 543 F.3d 363, 368 (7th Cir. 2008) ("When more than one defendant is charged in an indictment, the Speedy Trial clock begins to run on the date of the last co-defendant's initial appearance, which is usually arraignment."). The days through May 1, 2007 did not count against the seventy-day limit.

The continuances James himself requested further kept the speedy trial clock from running. The Speedy Trial Act also specifically excludes from the time computation:

> Any period of delay resulting from a continuance granted . . . at the request of the defendant or his counsel . . . , if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(3)(7)(A). If the district court is inclined to grant a continuance under this provision, it must also set forth "its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." *Id.*

On April 18, 2007, even before Harris made his initial appearance, James filed a motion to continue his trial. In support of the motion, counsel stated that he needed additional time to review discovery, confer with James and prepare his defense. The district court granted James's motion and continued the trial until July 2, 2007. Before July 2 arrived, James filed another motion to continue his trial. The district court granted that motion as well and continued the trial until August 20.[1] The district court specifically found during each grant that a failure to grant the motion would likely result in a mis-

---

[1] Neither motion for continuance contained a request for time to prepare pretrial motions, so we do not expect the Supreme Court's recent grant of certiorari in *Bloate v. United States*, No. 08-728, 2009 WL 1034612 (U.S. Apr. 20, 2009), to affect this case.

carriage of justice and that the ends of justice warranted the continuances. Therefore, the additional time resulting from James's own requests to continue the trial are excluded. The days after August 20 counted toward the seventy-day limit, but the trial's commencement on September 24 meant that it fell within the time allowed under the Act. No Speedy Trial Act violation occurred.

> 2.   Sufficient evidence supported James's conspiracy conviction.

James also argues that insufficient evidence supports his conviction for conspiring to distribute crack cocaine. When reviewing a challenge to the sufficiency of the evidence supporting a verdict, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Seymour*, 519 F.3d 700, 714 (7th Cir. 2008). We will overturn the jury's guilty verdict only if "'the record contains no evidence, regardless of how it is weighed,'" from which the jury could have found beyond a reasonable doubt that James was guilty of conspiring to sell crack cocaine. *United States v. James*, 540 F.3d 702, 706 (7th Cir. 2008) (quoting *United States v. Gougis*, 432 F.3d 735, 743-44 (7th Cir. 2005)).

James does not dispute that he was a crack cocaine dealer. Instead, he maintains that he was not a member of a *conspiracy* to sell crack. The essence of a conspiracy is an agreement between two or more people to engage in

criminal activity. *United States v. Zaragoza*, 543 F.3d 943, 947 (7th Cir. 2008). Simple buy-sell transactions are not enough to constitute the separate criminal object necessary for a conspiracy conviction, so the fact that James sold crack is not enough. *See id.*

In this case, sufficient evidence supports the jury's conclusion that James conspired with Morrow, Harris, and others to distribute crack cocaine. The jury could have concluded that James and the other indicted co-conspirators depended on each other to further their drug-trafficking goals. *See James*, 540 F.3d at 707. That evidence included that members of the conspiracy obtained their crack cocaine together, from Morrow's sources in Memphis and St. Louis. Morrow also referred customers to Harris when he ran out of crack cocaine. *See id.* (referring customers to others' houses if supply was low supports conclusion that conspiracy existed).

The jury also heard evidence of James's participation in the conspiracy and of how he worked to further the conspiracy. In *United States v. Haywood*, 324 F.3d 514, 517 (7th Cir. 2003), we found sufficient evidence supported a conspiracy conviction where two alleged co-conspirators "pooled their money and shared rides . . . in order to buy inexpensive crack, meaning that each could run a cheaper operation—and earn higher profits—if the other succeeded." That is true here as well. The jury heard that James pooled his money with that of Harris, Morrow, and the other alleged co-conspirators to buy larger amounts of crack cocaine from outside the state for resale. As in *Haywood*, James and the others pooled their money and shared rides to buy cheaper

crack, meaning that each could earn more if the others succeeded.

The out of state purchases happened at least biweekly, if not more, for several years, with all involved knowing that the crack cocaine would be resold. Although it is not clear from the record exactly how long James was involved with the other defendants, it is clear that it was far from a one-time occurrence. Notably, he tried to recruit others to join Morrow, Harris, and the others who were pooling their money together. A dealer who had been obtaining his crack from another source testified that James tried to talk him into going in with Morrow, Harris, and James to purchase crack in Memphis, saying he could get it for a better price than the other dealer's current supplier. James referred to his group as "the Memphis crew." Although the offer was declined, a few weeks later, James, with Morrow present, again unsuccessfully tried to persuade the same dealer to join his team. Also, from another witness's testimony that Harris's response to a request to buy crack cocaine was that he needed to wait for Morrow and James to return with the drugs, the jury could have concluded that James at least occasionally went along on the drug-purchasing trips. The jury therefore had sufficient evidence to find that James was a member of a conspiracy to distribute crack cocaine.

James emphasizes a statement in one of our previous cases that to find a conspiracy, we are "looking for evidence of a prolonged and actively pursued course of sales coupled with the seller's knowledge of and a shared stake in the buyer's illegal venture." *United States v.*

*Contreras*, 249 F.3d 595, 599 (7th Cir. 2001) (internal quotation marks and citation omitted). In *Contreras*, we were distinguishing a conspiracy from a mere buyer-seller relationship, the latter meaning a situation where one person merely buys drugs from another, which is insufficient to find a conspiracy. *See id.* at 598-99. As we discussed, James and his co-conspirators put their money and transportation resources together for an extended period of time, thereby having a stake in each other's success, *see Haywood*, 324 F.3d at 517, and knowing that the others intended to resell the crack cocaine. James may have had only a buyer-seller relationship with his customers, but the jury could have found he was involved in a conspiracy with Morrow, Harris, and the other indicted co-conspirators rather than a simple buyer-seller relationship. *See United States v. Williams*, 298 F.3d 688, 692 (7th Cir. 2002). Sufficient evidence supports James's conspiracy conviction.

### 3.    *Kimbrough* did not affect James's sentence.

James's final argument is that we should remand his case to ensure that the district court understood its ability to fashion a sentence in light of the Supreme Court's decision in *Kimbrough v. United States*, 128 S. Ct. 558 (2007), which the Court decided before James's sentencing hearing. We decline to do so because any disagreement with the crack cocaine guidelines would not have impacted James's sentence.

Had there not been an applicable statutory minimum, James's advisory guidelines imprisonment range would

have been 188 to 235 months. This range was calculated using guidelines for crack cocaine offenses and was higher than the range for powder cocaine offenses involving similar quantities. But, because his offense involved more than 50 grams of cocaine base and he had a prior felony drug conviction, James was subject to a statutory minimum of 240 months' imprisonment on his conspiracy conviction. *See* 21 U.S.C. §§ 841(b)(1)(A)(iii), 846, 851. After *Kimbrough*, sentencing courts are still bound by the minimum sentences set forth in the United States Code, *Kimbrough*, 128 S. Ct. at 573, so the district court had to sentence James to at least 240 months.

During the sentencing hearing, the district court recognized the statutory minimum and then explained why it decided to sentence James to 295 months' imprisonment, nearly five years above the minimum. This explanation included a discussion of James's past, which contained a state-court murder conviction, multiple problems with the law, and a history of disobeying court orders. In that light, the district court concluded that a 295-month sentence was necessary to deter James from committing future crimes and to protect the public.

Any disagreement the district court might have had with the crack cocaine guidelines would not have impacted James's sentence. The crack and powder guidelines ranges were both below the statutory minimum. So even if the district court had been inclined to treat a crack cocaine offense equivalent to a powder cocaine one, it would not have made a difference here as the higher 240-month statutory minimum took precedence and the

district court explained why it decided to impose a sentence well above that minimum. *Cf. United States v. Padilla*, 520 F.3d 766 (7th Cir. 2008) (vacating above-minimum sentence and remanding where sentencing took place before *Kimbrough* and it was unclear whether court would have sentenced differently in its wake). Therefore, James is not entitled to the limited remand under *United States v. Taylor*, 520 F.3d 746 (7th Cir. 2008), that he seeks. Finally, we note that James filed a pro se statement with undeveloped claims. If James wishes to pursue his ineffective assistance of counsel claim, it would best be brought in a proceeding under 28 U.S.C. § 2255. *See United States v. Chavers*, 515 F.3d 722, 726 (7th Cir. 2008); *United States v. Turcotte*, 405 F.3d 515, 537 (7th Cir. 2005).

B.    Harris's case is remanded in light of *Kimbrough*.

Harris challenges only his sentence. At his sentencing hearing about a month after *Kimbrough*, Harris's counsel argued that Harris should receive the ten-year statutory mandatory minimum, or, in light of recent Supreme Court cases, a sentence more consistent with that of a powder cocaine offender. By doing so, the government agrees that Harris preserved his *Kimbrough* argument for review. During the hearing, Harris's counsel also called Harris "a rarity" and pointed out that he had no criminal history points, had been employed at the time his case went to trial, and had the support of his mother and other family members who were present at the sentencing. His counsel further argued, and the

government agreed, that he had a lesser role in the scheme than that of other defendants.

The district court calculated Harris's advisory guidelines range of imprisonment (based on the offense involving crack cocaine) as 235 to 293 months. It did not address Harris's argument that he should receive a sentence more in line with that of a powder cocaine offender. The district court ultimately imposed a sentence of 235 months, at the low end of this range, but it said that it was "truly a waste of time for someone like [Harris] to be going to prison for as long as [he's] going to be in prison." In light of this statement, the government agrees a remand is needed to ensure the district court understood that it could vary from the crack/powder ratio set forth in the guidelines, and also from the guidelines themselves. *See Kimbrough*, 128 S. Ct. at 575. Although the government's brief stated that a limited remand in accordance with the procedure we announced in *United States v. Taylor*, 520 F.3d 746, 748 (7th Cir. 2008), is in order, Harris is entitled to a full resentencing because he preserved his argument by raising it at the initial sentencing hearing. *See United States v. Bryant*, 557 F.3d 489, 496 (7th Cir. 2009) (vacating sentence and remanding for resentencing where issue preserved at sentencing hearing).

### C.  Morrow's case is remanded for resentencing.

Finally, we turn to David Morrow, who like Harris challenges only his sentence. Morrow maintains that the district court provided an insufficient explanation for its decision to sentence him to 504 months' imprisonment.

After the prosecutor and defense counsel concluded their arguments at the sentencing hearing, the district court said:

> the Court's considered all the information in the presence report including guideline computations and factors set forth in 18 U.S.C. § 3553(a). Pursuant to the Sentencing Reform Act of 1984, it is the judgment of this Court that the defendant, David T. Morrow, is hereby committed for a term of 504 months on Count I, 240 months on Count 10. The terms are to run concurrently.

The district court said nothing further during the hearing about its rationale for imposing a 504-month sentence, and Morrow maintains that more explanation is needed.

A provision in the United States Code, 18 U.S.C. § 3553(c), states that "at the time of sentencing," a sentencing judge "shall state in open court the reasons for its imposition of the particular sentence." The statute also says that if a sentence is within an advisory guidelines range, "and that range exceeds 24 months," the judge shall state as well "the reason for imposing a sentence at a particular point within the range." 18 U.S.C. § 3553(c)(1). The Supreme Court explained that the requirement in § 3553(c) that a judge state its reasons for a sentence in court reflects sound judicial practice, but that the appropriateness of how much to say "depends upon circumstances." *Rita v. United States*, 551 U.S. 338, 356 (2007).

An appellate court's review of a sentence is for reasonableness, and the more explanation we have, the better equipped we are to assess whether an imposed sentence meets that standard. *See id.* at 356-57. Less explanation is

typically needed when a district court sentences within an advisory guidelines range. *See id.*; *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005); *see also United States v. Rodriguez-Alvarez*, 425 F.3d 1041, 1047 (7th Cir. 2005) (explaining that § 3553(c) does not require a detailed recitation of all the § 3553(a) factors when a court sentences within a guidelines range). Here, the 504-month sentence was within the guidelines range. But it's quite the range: 360 months to life. That means that the 504-month sentence Morrow received was twelve *years* more than the low end of his advisory guidelines range. (The 33 to 41 month range at issue in *Rita* spanned only 8 months, and the longest span in a guidelines range where "life" is not an endpoint is 81 months.)

If the oral explanation were the only one the district court provided, we might have more concern. That is especially true since neither party requested a sentence of 504 months (the government had asked for life). However, the record also contains a Statement of Reasons that the district court filed four days after judgment. In it, the court explained as the reason for its sentence: "The Court sentences the defendant to 504 months. This is the defendant's fifth felony conviction with four being drug cases. The defendant has prior convictions involving guns. The defendant was a leader in the drug business."[2] Although the parties did not direct us to the

---

[2] We note that three of the four drug convictions were for marijuana possession. The other was a conviction for

(continued...)

statement, in line with our encouragement that sentencing judges commit difficult sentencing decisions to paper, we have considered such statements before. *See United States v. Burton*, 543 F.3d 950, 953 (7th Cir. 2008). We consider it here as well, but it does not end our inquiry into whether the sentencing explanation was sufficient.

We have long recognized that a discourse of every single § 3553(a) factor is not always necessary or practical, especially when the sentence is within the guidelines range. *Dean*, 414 F.3d at 729. But it is also the case that a "rote statement that the judge considered all relevant factors will not always suffice." *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). In particular, when a court has "passed over in silence the principal argument made by the defendant even though the argument is not so weak as not to merit discussion," we do not have the assurance we need to satisfy ourselves that the defendant's individual circumstances have been thoroughly considered. *Id.* Morrow's counsel raised his client's poor health to the district court at sentencing and argued that it militated in favor of a sentence at the low end of the guidelines range. The Presentence Report spelled out that Morrow had been diagnosed with diabetes in January 2006, and, only ten months later, had to have his left leg amputated. In a separate sentencing recommendation section, the

---

[2] (...continued)

possessing crack cocaine with the intent to sell it for which Morrow received a two-year sentence.

Report also said: "Mitigating factors in this case include health concerns. He has had significant complications as a result of diabetes, including the amputation of one leg."

It is true that counsel could have done a better job highlighting the disease's complications at the sentencing hearing. Nonetheless, Morrow's argument based on his health was not one that was clearly without merit such that it could be passed over without comment. A district court, in its discretion, can consider a defendant's physical impairments in determining an appropriate sentence. *See United States v. Millet*, 510 F.3d 668, 680 (7th Cir. 2007) (stating that although U.S.S.G. § 5H1.4 provides that physical condition is not ordinarily relevant in the decision to depart downward from the guidelines unless the impairment is "extraordinary," a district court can consider physical impairments when exercising its discretion in accordance with § 3553(a)); *cf. United States v. Allday*, 542 F.3d 571, 573-74 (7th Cir. 2008) (affirming sentence where court explained its reasons, took into account the defendant's health problems, and concluded that the Bureau of Prisons could adequately treat the defendant's health issues, including his sleep apnea and diabetes).

More to the point, in *United States v. Wurzinger*, 467 F.3d 649 (7th Cir. 2006), we said in considering a sentencing challenge that the defendant's "strongest argument is that his diabetes will kill him before he is free." *Id.* at 651. Like Morrow, the defendant in *Wurzinger* was already experiencing complications from his diabetes. Because the district court in *Wurzinger* explicitly

recognized the defendant's illness at sentencing but pointed to other factors that, despite the illness, warranted the sentence, we found no error in the sentencing decision. *Id.* at 653-54. (We expressed no opinion as to whether a lower sentence also would have been reasonable.) Similarly, in *United States v. Bullion*, 466 F.3d 574 (7th Cir. 2006), we affirmed a sentence where the district court had weighed the defendant's insulin-dependent diabetic status and age against his dangerousness to society. In this case, though, we cannot assure ourselves that the district court weighed Morrow's health complications against other factors when it imposed the 504-month sentence, as we see no indication that the district court considered it. We therefore remand Morrow's case for resentencing.

As we do so, we note that we asked the government at oral argument whether, if we rejected Morrow's argument that the explanation was insufficient, a remand under *Taylor*, 520 F.3d 746, was appropriate for Morrow as the government had said it was for Harris. The government responded that such a remand would not aid Morrow because he admitted responsibility for more than 4.5 kilograms of crack cocaine (he admitted to 4.88 kilograms, to be exact).

In 2008, the United States Sentencing Commission reduced the base offense levels for many crack cocaine offenses. *See* U.S.S.G. § 2D1.1(c); Supp. to App. C, 226-31 (2008) (Amendment 706). The Commission made these changes retroactive. *See* U.S.S.G. § 1B1.10(a)(1); *see also* 18 U.S.C. § 3582(c). However, the new guideline, like the previous guideline, kept the base offense level at 38 for

a defendant who is responsible for more than 4.5 kilograms of crack cocaine. *See* U.S.S.G. § 2D1.1(c). Therefore, a defendant responsible for more than 4.5 kilograms of crack cocaine cannot benefit from Amendment 706 and will not receive any relief on an 18 U.S.C. § 3582(c) motion for a reduction in sentence in light of that amendment. *United States v. Forman*, 553 F.3d 585, 590 (7th Cir. 2009).

But there is no 4.5 kilogram limitation on the applicability of *Kimbrough* at an initial sentencing hearing. Under the new guidelines, while the base offense level is 38 when the controlling quantity is 4.5 kilograms or more of crack cocaine, the level is only 30 when the measuring stick is 4.5 kilograms (or 4.88 kilograms) of powder cocaine. *See* U.S.S.G. § 2D1.1(c). Under *Kimbrough*, a sentencing judge can take this disparity into account when deciding what sentence to impose. So the district court may consider the impact of *Kimbrough* during Morrow's resentencing as well.

## III.  CONCLUSION

We AFFIRM the convictions and sentence of appellant James. Harris's and Morrow's cases are REMANDED for resentencing.

---