NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

MAY 19 2016

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 15-30127 |
| Plaintiff-Appellee, | D.C. No. 3:14-cr-00275-JO-1 |
| v. | |
| MARK DOUGLAS GILL, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the District of Oregon
Robert E. Jones, District Judge, Presiding

Argued and Submitted May 6, 2016
Portland, Oregon

Before: TASHIMA, TALLMAN, and HURWITZ, Circuit Judges.

Law enforcement officials obtained a warrant to search Mark Gill's home for

evidence of witness tampering and conspiracy to commit witness tampering in

connection with the prosecution of Dave Corbit, a leader of the Krude Rude Brood

("Brood") gang. The search revealed methamphetamine, which Gill confessed to

dealing. Gill appeals his convictions for conspiracy to distribute

---

[*] This disposition is not appropriate for publication and is not precedent except
as provided by Ninth Circuit Rule 36-3.

methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & 846, and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C). We affirm the possession conviction, but reverse the conspiracy conviction.

**1.** Gill argues that the district court erred in denying his request for a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). But, as the district court recognized, it "in essence" granted his *Franks* request by allowing him to present under an offer of proof rubric all evidence he wished to present about the accuracy of the search warrant affidavit. In any case, Gill did not establish that any alleged misstatements in the affidavit were material to the existence of probable cause that he was involved in a witness tampering scheme.

**2.** The affidavit alleged that (1) Corbit appeared to be looking for extra-legal ways to avoid prosecution; (2) Corbit's gang associates, including the widely-feared Bobby Hammond, were looking for a witness because of her anticipated testimony against Corbit; (3) Hammond sought to cover his tracks; (4) the man Hammond hired, Deuce Romero, was going to stop looking for the witness out of respect for a former boyfriend of the witness's friend; and (5) Gill, a Brood associate, was part of the scheme. The district court did not err in finding that the affidavit established probable cause and denying the motion to suppress.

**3.** Gill argues that the district court erred by refusing to compel the government to grant use immunity to Deuce during the *Franks* hearing and to Gill's alleged co-conspirator, Reanna Erickson, at trial. There is no evidence, however, that the prosecutor caused Deuce to invoke the Fifth Amendment. *See United States v. Straub*, 538 F.3d 1147, 1162 (9th Cir. 2008). The prosecutor may have indirectly caused Erickson to invoke her Fifth Amendment rights by ensuring that she was provided with counsel. But, this was a responsible thing to do, and there is no evidence that the prosecutor threatened Erickson or otherwise acted "with the purpose of distorting the fact-finding process." *Id.*

**4.** The district court admitted text messages from Erickson to a person identified in her phone as "Gill Mark" as statements by a party and a co-conspirator. Gill argues that the label "Gill Mark" was inadmissible hearsay. But, a label bearing a name is not an assertion, and therefore not hearsay. *United States v. Snow*, 517 F.2d 441, 442–44 (9th Cir. 1975). Moreover, Gill admitted that the phone number associated with the text messages was his.

**5.** Gill also argues that the district court erred in admitting texts between Erickson and DJ Probasco. Gill waived this argument by failing to adequately raise it in his opening brief. *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996). In any event, any error was harmless: the conversation established only that

Erickson had sought to buy methamphetamine from Probasco, an unimportant fact given that Gill admitted that Probasco was one of his sources.

6.  Gill argues that the district court committed plain error by failing to give a specific unanimity instruction. Such an instruction might have been useful, because the government's summary chart could have led the jury to believe there were multiple conspiracies. *See United States v. Lapier*, 796 F.3d 1090, 1096 (9th Cir. 2015). But, any error was not plain: the vast majority of the conspiracy evidence was about Gill and Erickson, and in closing argument, the prosecutor repeatedly referred only to Erickson as Gill's co-conspirator.

7.  The evidence does not support Gill's conviction for conspiracy to distribute methamphetamine. Viewed in the light most favorable to the government, the evidence shows only that Gill and Erickson, who sold separately, bought dealer-sized quantities of methamphetamine together once and discussed doing so another time; and that Erickson lived in Gill's house for a few days. There was no evidence of an agreement to distribute jointly or in parallel. In contrast to the cases cited by the government, there was no evidence of "a prolonged and actively pursued course" of joint purchases or "a shared stake in the [other] buyer's illegal venture." *United States v. Moe*, 781 F.3d 1120, 1125 (9th Cir. 2015) (quotation marks omitted); *see also United States v. Foy*, 641 F.3d 455, 466 (10th Cir. 2011) (the conspirators "regularly pooled their money together to purchase

4

multiple-kilogram quantities of cocaine, treated their debts to their drug supplier as common debts, coordinated the distribution of large amounts of cocaine, and discussed taking a large amount of cocaine from their supplier without paying for it"); *United States v. Thornton*, 609 F.3d 373, 380 (6th Cir. 2010) (the joint purchases occurred "every day for at least two months"); *United States v. Harris*, 567 F.3d 846, 851 (7th Cir. 2009) (the joint purchases "happened at least biweekly, if not more, for several years").

8.    Because we reverse Gill's conspiracy conviction, we vacate the sentence and remand for resentencing on an open record so that the district court may resentence Gill without relying on the conspiracy count.[1]

**AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED.**

---

[1]    Because we reverse the conspiracy count conviction for insufficiency of the evidence, Gill may not be retried on that count.  *United States v. DeJarnette*, 741 F.3d 971, 985 (9th Cir. 2013) ("Because the evidence was insufficient, the Double Jeopardy Clause forbids a second trial." (citation and internal quotation marks omitted)).

*United States v. Gill*, No. 15-30127

TALLMAN, Circuit Judge, concurring in part and dissenting in part:

I concur in all aspects of the majority's disposition except for the reversal of the Count I conviction for conspiracy to distribute methamphetamine. *See* Majority Disposition at 4-5. As to the court's conclusion that the evidence was insufficient to support the guilty verdict on that charge, I respectfully dissent. Unlike a jury, we are tasked with viewing the evidence in the light most favorable to support its determination. *United States v. Mincoff*, 574 F.3d 1186, 1191-92 (9th Cir. 2009). We all agree the jury properly found Gill guilty of possession with intent to distribute methamphetamine, as charged in Count II. The question the jury answered affirmatively in Count I was whether Gill conspired with Erickson to acquire the drug for distribution when they pooled their money to get a better price on larger quantities from the supplier of the methamphetamine. Applying the teachings of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a rational juror could certainly find on this record that the prosecution established the essential elements of conspiracy to distribute methamphetamine beyond a reasonable doubt.

The majority overlooks the fact that conspiracy to distribute drugs requires only an agreement to accomplish a criminal objective. *See United States v. Suarez*, 682 F.3d 1215, 1219 (9th Cir. 2012). No overt act is required. *See id*. Here, the jury had ample evidence of an agreement between Gill and Erickson to acquire

drugs so they could each thereafter distribute methamphetamine. The jury saw the real time text messages between Gill and Erickson, in which they discussed pooling their money together to buy methamphetamine from a Mexican supplier. The jury heard from government witnesses that the amount of methamphetamine Gill and Erickson could obtain with their pooled resources was a large quantity meant for distribution. We should not create an unnecessary split with our sister circuits who have ruled that pooling resources to buy distribution levels of drugs may support a conviction for conspiracy to distribute. *See, e.g., United States v. Foy*, 641 F.3d 455, 465-66 (10th Cir. 2011); *United States v. Thornton*, 609 F.3d 373, 380 (6th Cir. 2010); *United States v. Harris*, 567 F.3d 846, 851 (7th Cir. 2009). Common sense tells us the same. The text messages show that Gill and Erickson believed that by pooling their resources, they could get a better wholesale price before reselling the methamphetamine to their customers. The text messages also established that Gill and Erickson met the same day so Erickson could give her share of the buy money to Gill.

But that's not all the jury heard about Gill and Erickson. The jury also had evidence that when asked about a later text exchange, Erickson said that "she and Mr. Gill were discussing putting together a drug deal . . . [though she maintained] that it never came together." The jury also learned that Gill admitted to the officers

2

executing the search warrant that he was a "drug dealer" and that he had given Erickson an amount of methamphetamine an officer later testified was a "dealer amount of methamphetamine, not a user amount." This "dealer amount" was then found at Gill's house in Erickson's purse. But that's still not all the jury knew about Gill's and Erickson's activities. Also discovered at Gill's house were additional distribution-level quantities of methamphetamine, digital scales, replica firearms, a police scanner, several cell phones, a Tupperware container with methamphetamine residue, and $600 cash–$156 of which was in Erickson's purse. Also present during the search was Erickson herself, who the officers learned had been staying at Gill's house. In short, both had a motive to pool their resources, they did so, and then jointly were found to later be in possession of the drugs and distribution paraphernalia, which are the tools of their illicit trade. What more did the jury need to support the sensible conclusion that they conspired to distribute methamphetamine?

The majority relies on *United States v. Moe*, 781 F.3d 1120 (9th Cir. 2015), to imply that a conspiracy to distribute requires evidence of "a prolonged and actively pursued course" or "a shared stake in the [other] buyer's illegal venture." Majority Disposition at 4. But *Moe* actually emphasizes that "[d]istinguishing between a conspiracy and a buyer-seller relationship requires a fact-intensive and

3

context-dependent inquiry" that does not turn on specific factors or bright-line rules. 781 F.3d at 1125. Taking the evidence in the light most favorable to support its collective judgment, a rational jury could find that the evidence presented demonstrated more than a buyer-seller relationship. *See id.* at 1125-26 (recognizing that factors such as "mutual trust" and "whether the transactions were standardized" were also relevant to distinguish conspirators from buyers-sellers).

We should affirm Gill's conviction for conspiracy to distribute methamphetamine.