In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2576

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

REX A. HOPPER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 4:17-cr-40034-JPG-1 — **J. Phil Gilbert**, *Judge.*

ARGUED APRIL 4, 2019 — DECIDED AUGUST 20, 2019

Before RIPPLE, HAMILTON, and ST. EVE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In June 2017, a federal grand jury indicted Rex Hopper on one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846 and 18 U.S.C. § 2. Mr. Hopper was part of a community of methamphetamine users and sellers in southern Illinois. Several of these individuals signed proffer letters with the Government, agreeing to provide testimony against Mr. Hopper in exchange for leniency. Most of these witness-

es subsequently entered plea agreements.[1] Mr. Hopper, however, pleaded not guilty to the single count in the indictment and proceeded to trial before a jury in late February 2018.

Over the course of three days, the Government presented the testimony of approximately twenty witnesses against Mr. Hopper. The district court denied Mr. Hopper's motion for disclosure of the proffer letters given to these witnesses. Following deliberations, the jury found Mr. Hopper guilty of conspiracy to distribute methamphetamine, as charged in the indictment, and returned a special verdict form finding that the conspiracy involved an amount of 50 grams or more.

Based on interviews with other participants in the conspiracy, the probation office determined that Mr. Hopper's relevant conduct involved 1.968 kilograms of ice methamphetamine. This drug amount corresponded to a base offense level of 36. At sentencing, the district court determined that Mr. Hopper was subject to a two-level sentence enhancement for maintaining a residence for the purpose of distributing methamphetamine. Based on a total offense level of 38 and a criminal history category of I, the court calculated a guidelines imprisonment range of 235 to 293 months. The district court sentenced Mr. Hopper at the bottom of the guidelines range to 235 months' imprisonment, followed by four years of supervised release.[2]

---

[1] One witness entered an "open" guilty plea, for which there was no written plea agreement.

[2] The district court had jurisdiction under 18 U.S.C. § 3231.

Mr. Hopper now challenges both his conviction and his sentence. First, we conclude that the Government presented sufficient evidence to prove that Mr. Hopper engaged in a conspiracy to distribute methamphetamine in southern Illinois, and that there was no material variance between the conspiracy charged in the indictment and the Government's proof at trial. Second, the district court did not err when it denied Mr. Hopper's motion for disclosure of the cooperating witnesses' proffer letters. Third, the district court properly concluded that Mr. Hopper was subject to a two-level sentence enhancement for maintaining his Creal Springs residence for the purpose of distributing methamphetamine. However, we conclude that the district court plainly erred when it calculated Mr. Hopper's relevant conduct and corresponding guidelines range. In context, it is clear that, in their separate interviews, Lucas Holland and Randall Riley were describing the same transactions. By including the amounts described by both Holland and Riley in the calculation of Mr. Hopper's relevant conduct, the presentence report ("PSR"), adopted by the district court, erroneously double-counted those drug quantities.

For the foregoing reasons, we affirm Mr. Hopper's conviction for conspiracy to distribute methamphetamine. We also affirm the district court's determination that he was subject to a sentence enhancement for maintaining a drug premises. Because the court plainly erred in calculating his relevant conduct, however, we vacate Mr. Hopper's sentence and remand his case to the district court for resentencing.[3]

---

[3] We have jurisdiction over this appeal under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## I.

## BACKGROUND

### A.

In April 2017, law enforcement officers executed a search warrant at Mr. Hopper's residence. They sought to recover items involved in a burglary. Officers observed drug paraphernalia and methamphetamine in plain view. Accordingly, the officers obtained and executed a second search warrant for the residence. Upon finding additional drug paraphernalia and methamphetamine in his home, officers took Mr. Hopper into custody. A federal grand jury later returned an indictment charging Mr. Hopper with one count of conspiracy to distribute methamphetamine, in violation of 18 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846 and 18 U.S.C. § 2, in the Southern District of Illinois.

### B.

Mr. Hopper was part of a community of methamphetamine users and sellers in southern Illinois. Around the time of his indictment, the Government also charged other members of this group with conspiracy to distribute methamphetamine. Several of these individuals received proffer letters from the Government and subsequently agreed to provide testimony against Mr. Hopper in exchange for leniency. Most of these witnesses later entered plea agreements. Mr. Hopper, however, pleaded not guilty to the single count in the indictment and proceeded to trial before a jury in late February 2018.

Before the trial began, counsel for Mr. Hopper renewed a previous motion for disclosure of the proffer letters given to the witnesses who would testify against Mr. Hopper. Refer-

encing our decision in *United States v. Weidenburner*, 550 F. App'x 298 (7th Cir. 2013) (unpublished), counsel recognized that "[t]he Seventh Circuit has ruled that" proffer letters "are not materials that have to be provided."[4] Nevertheless, counsel wanted "the record to be clear" that he thought he "ought to be provided a copy" of the proffer letters.[5]

Counsel for Mr. Hopper explained that the proffer letter "is an agreement that sets forth the ground rules" for what testimony "may or may not lead to a plea agreement."[6] He submitted that "this is a very important aspect of the defense" because "no plea agreements are offered until you proffer."[7] In other words, the proffer letters are "part of the process by which men and women ultimately find their way on to the stand to give testimony against a defendant."[8] As a result, counsel asserted, "if the[] jurors don't have some understanding of this process," the defense would be "really hampered in terms of our constitutional right[s] to put on a defense and … to confront the witnesses through cross examination that are here to accuse Rex Hopper of various crimes."[9]

Relying on our decision in *Weidenburner*, the Government responded that "the Seventh Circuit is clear that the proffer

---

[4] R.118 (Trial Tr. Day 1) at 8.

[5] *Id.* at 5.

[6] *Id.* at 6.

[7] *Id.*

[8] *Id.*

[9] *Id.* at 7.

letters don't come in," nor does "any information about the proffer," "because it is a preliminary step in the plea agreement, and then the plea agreement supersedes all that."[10] Turning to defense counsel, the court stated, "I think it is pretty clear that, you know, you are not going to get the documents."[11]

The Government further noted its objection to defense counsel asking any questions about the process of entering a plea agreement. The court asked defense counsel what kind of questions he intended to ask the cooperating witnesses. Counsel explained that he wanted the jury to know that before entering a plea agreement, a witness had to meet with federal agents and "understood that agents would decide and the prosecutors would decide whether you told the truth, and if they didn't think you told the truth that a plea agreement would not be tendered."[12] Counsel acknowledged that he planned to review the terms of the plea agreements with each witness, but argued that the jury would be "missing a big part of this process" without the proffer letters.[13] Based on our decision in *Weidenburner*, the Government reiterated that the plea agreement "supersede[s] the proffer letter" and is "the document which the defendant is entitled to and entitled to question witnesses about."[14] The court denied the motion for disclosure of the

---

[10] *Id.* at 8.

[11] *Id.*

[12] *Id.* at 10.

[13] *Id.* at 11.

[14] *Id.* at 14.

proffer letters and ruled that counsel could ask the witnesses "whether they've entered into a proffer agreement, but going into the terms of it that are super[s]eded by the plea agreement, I'm not going to let you do."[15]

### C.

Mr. Hopper proceeded to trial before a jury on February 26, 2018. Over the course of three days, the Government presented the testimony of approximately twenty witnesses against Mr. Hopper. Set forth below is a summary of the witnesses and testimony relevant to this appeal.

Dameon Williams testified that he met Mr. Hopper sometime in 2015 when they were "messing with drugs."[16] He obtained ice methamphetamine from Mr. Hopper "[o]ff and on" for about one year.[17] On these occasions, he received about one to two ounces of methamphetamine at a cost of $900 to $1200 per ounce. Williams stated that sometimes, he bought the drugs outright, while other times Mr. Hopper provided the drugs to him "on credit," or on a "front."[18] He explained that, in this fronting arrangement, Mr. Hopper provided Williams a quantity of drugs, some of which Williams sold to others in order to pay Mr. Hopper back. He further testified that Mr. Hopper called Williams occasionally and asked him to visit the homes of customers who owed Mr. Hopper money and bring them to Mr. Hopper's house

---

[15] *Id.* at 15–16.

[16] *Id.* at 59.

[17] *Id.*

[18] *Id.* at 61.

to settle the debt. He explained that he helped Mr. Hopper collect money from his customers because Williams "was selling drugs for him" and "to help him out in his drug business."[19]

Brooke Peyton testified that she met Mr. Hopper in 2016 when she was dating William, also known as "Andy," Karnes. With Karnes, she had visited Mr. Hopper's residence in Creal Springs, where Mr. Hopper provided ice methamphetamine to Karnes. She stated that during the summer of 2016, Mr. Hopper provided Karnes three to five "8-balls," or 3.5 gram quantities of ice methamphetamine, several times a week.[20] Karnes obtained the methamphetamine from Mr. Hopper "[o]n a front," in which he would sell drugs to others in order to pay Mr. Hopper back for the drugs he had obtained previously.[21] Peyton further testified that sometimes, Mr. Hopper came to her home to drop off methamphetamine for Karnes. On other occasions, he sent Williams to deliver the drugs.

Robert Weir, also known as "Boog," testified that he and Mr. Hopper reconnected around April or May 2015. At some point, he, Mr. Hopper, Lucas Holland, and Randall Riley began an arrangement in which the four of them pooled their money together to purchase methamphetamine from a source in Cape Girardeau, Missouri. Sometimes, Weir gave Mr. Hopper his money, and Mr. Hopper drove to Murphysboro, where he gave Weir's and his money to Riley to pur-

---

[19] *Id.* at 64.

[20] *Id.* at 89.

[21] *Id.* at 90.

chase the drugs. Other times, Mr. Hopper gave Weir his money, and Weir delivered the money to Riley. Still other times, Weir and Mr. Hopper visited Riley together. After Riley obtained the drugs from Cape Girardeau, the group divided the methamphetamine into equal, one-ounce shares. Weir stated that he paid about $800 to $900 per ounce of methamphetamine. This arrangement lasted about a month, during which the group obtained methamphetamine two to three times per week.

In March 2016, police arrested Riley. Weir and Mr. Hopper then arranged to pool their money with Holland to purchase methamphetamine. Holland took their money and ran, and they never got their drugs. Additionally, Weir acknowledged that he had personally observed Mr. Hopper distribute methamphetamine to other individuals.

Lucas Holland testified that, at the beginning of 2016, he had been living at Riley's house for about four or five months. Holland confirmed the details of the pooling arrangement he engaged in with Mr. Hopper, Riley, and Weir to purchase methamphetamine from a source in Cape Girardeau. He reiterated that Mr. Hopper or Weir, or sometimes the two together, came to Riley's house to deliver their money. Holland and Riley then drove to Cape Girardeau to obtain the methamphetamine. When Holland and Riley returned to Illinois, the group of four split up the drugs. According to Holland, this arrangement lasted from about December 2015 to February 2016.

Holland testified that, on one occasion, he traveled to Cape Girardeau with Riley, Mr. Hopper, and Erin Wright, Mr. Hopper's girlfriend, for a drug deal that Mr. Hopper had arranged. The group pooled their money, and Mr. Hop-

per gave it to an individual in Cape Girardeau. In addition, Holland confirmed that a few days after police arrested Riley, Mr. Hopper and Weir gave him money to purchase drugs. He acknowledged that he "ran off with it."[22] Holland also testified that he had observed Mr. Hopper sell methamphetamine to individuals, including Kevin Shuman, at his home in Creal Springs.

Randall Riley testified that he met Mr. Hopper around the end of 2015 or early 2016 through a mutual acquaintance when Mr. Hopper was seeking methamphetamine. Riley confirmed that eventually, he, Mr. Hopper, Holland, and Weir began a pooling arrangement in which they combined their money to purchase methamphetamine from a source in Cape Girardeau. According to Riley, the group bought four ounces of methamphetamine every day and split the drugs between the four of them. Either Mr. Hopper, Weir, or both came to Riley's home with $2,200 for Mr. Hopper and Weir's shares. Riley and Holland drove to Missouri to obtain the drugs. When they returned, they met either at Riley's home or at Mr. Hopper's residence in Creal Springs to divide up the drugs.

Riley confirmed that on one occasion, his source was unavailable, so Mr. Hopper arranged a transaction with his own source. He, Riley, Holland, and Wright drove to Cape Girardeau, where Mr. Hopper gave the source the money they had pooled together.

Blake Gordon testified that he met Mr. Hopper through Weir. According to Gordon, he sold methamphetamine to

---

[22] R.122 (Trial Tr. Day 2) at 54.

Mr. Hopper "more than ten times."[23] On such occasions, he provided Mr. Hopper methamphetamine in amounts ranging from one to fourteen grams. He also stated that "on numerous occasions," he drove Mr. Hopper around the southern Illinois area to deliver drugs to his customers.[24] Gordon described one occasion in which he, Mr. Hopper, and Weir pooled their money together. Weir drove to Cape Girardeau to obtain the methamphetamine, which they divided among the three of them when he returned to Illinois.

Crystal Boulton testified that in March 2016, she and her children were living at Riley's home with Riley, her boyfriend, as well as Holland and his girlfriend. She stated that she personally observed Mr. Hopper obtain methamphetamine from Riley at Riley's residence about four or five times. On such occasions, Mr. Hopper paid Riley for the methamphetamine and Riley gave Boulton the money to count. She counted about $1,000 to $1,200 per ounce of methamphetamine. Boulton also overheard discussions between Riley and Mr. Hopper about pooling their money together and making trips to Cape Girardeau to obtain methamphetamine.

Erin Wright testified that she met Mr. Hopper in September 2015 and moved in with him at his home in Creal Springs soon after. She confirmed that Mr. Hopper and Weir went to Riley's house to get drugs. Usually, Mr. Hopper returned with an ounce of methamphetamine. She stated that Mr. Hopper had scales at his Creal Springs home, which he used to weigh drugs. She further testified that, sometimes,

---

[23] *Id.* at 123.

[24] *Id.*

Riley and Holland came to the Creal Springs home to do business with Mr. Hopper. She described one occasion on which she and Mr. Hopper went to Kansas City, Missouri, where Mr. Hopper and an individual named Jason Clapp obtained methamphetamine. Wright stated that there were also a few times when Clapp came to the Creal Springs residence to provide Mr. Hopper with methamphetamine.

William Craig testified that he knew Mr. Hopper through Weir. He bought methamphetamine from Mr. Hopper about ten or fifteen times. On such occasions, he obtained methamphetamine in quantities up to eight ounces. When Craig obtained the methamphetamine for himself, Mr. Hopper would not charge him. When Craig purchased the methamphetamine to deliver to others, he paid Mr. Hopper in cash. Craig stated that on one occasion, after Mr. Hopper and Weir pooled their money together, Craig drove with Weir to Charleston, Missouri, to purchase methamphetamine. They returned to Mr. Hopper's home, where Mr. Hopper and Weir divided the drugs. Craig also confirmed that he had seen Mr. Hopper sell methamphetamine at his home to Kevin Page and to Andy Karnes on multiple occasions.

Kevin Shuman testified that he had known Mr. Hopper for years. He moved in with Mr. Hopper at his Creal Springs home and lived there in December 2015 and January 2016. Initially, he obtained "small amounts" of methamphetamine, ranging from "seven grams to an 8-ball," from Mr. Hopper.[25] Shuman bought the drugs "on a front," explaining that he sold drugs in order to repay Mr. Hopper for previously pur-

---

[25] R.123 (Trial Tr. Day 3) at 26.

chased quantities of methamphetamine.[26] He recalled two occasions on which he drove Mr. Hopper to Jackson, Missouri, to obtain methamphetamine. When they returned home, Mr. Hopper gave Shuman drugs in return for driving.

After a brief term in jail in early 2016, Shuman returned, and the quantities he bought from Mr. Hopper increased from grams to ounces of methamphetamine. The two had an arrangement in which Mr. Hopper placed methamphetamine for Shuman in the garage. Shuman, who was no longer living with Mr. Hopper, retrieved the drugs from the garage and left in their place the money he owed Mr. Hopper for previously fronted methamphetamine. Shuman further testified that he drove Mr. Hopper around southern Illinois to deliver methamphetamine to his customers.

## D.

At the close of the Government's case in chief, counsel for Mr. Hopper moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, which the court denied. Mr. Hopper elected not to testify, and the defense rested its case. Following jury instructions and closing arguments, the jury retired to deliberate. Approximately an hour later, the court received a note from the jury stating, "Pages 17 + 21 are confusing us as to the definition of 'conspiracy.'"[27] Page 17 of the jury instructions stated that:

> A conspiracy is an express or implied agreement between two or more persons to

---

[26] *Id.*

[27] R.72 at 1 (capitalization omitted).

commit a crime. A conspiracy may be proven even if its goal was not accomplished.

In deciding whether the charged conspiracy existed, you may consider all of the circumstances, including the words and acts of each of the alleged participants.[28]

Page 21 of the jury instructions stated that:

A conspiracy requires more than just a buyer-seller relationship between the defendant and another person. In addition, a buyer and seller of a mixture and substance containing methamphetamine do not enter into a conspiracy to distribute a mixture and substance containing methamphetamine simply because the buyer resells the [] mixture and substance containing methamphetamine to others, even if the seller knows that the buyer intends to resell the [] mixture and substance containing methamphetamine.

To establish that a seller knowingly became a member of a conspiracy with a buyer to distribute a mixture and substance containing methamphetamine, the government must prove that the buyer and seller had the joint criminal objective of distributing a mixture and

---

[28] R.74 at 17.

substance containing methamphetamine to others.[29]

After conferring with the parties, the court responded to the jury, "All instructions should be read together. I cannot give you any more instruction other than what you have been given."[30] Following further deliberations, the jury reached a verdict, finding Mr. Hopper guilty of conspiracy to distribute methamphetamine, as charged in the indictment. The jury returned a special verdict form finding that the conspiracy involved an amount of 50 grams or more.

## E.

Prior to Mr. Hopper's sentencing, the probation office prepared a PSR. To determine the scope of his relevant conduct, the probation office interviewed several witnesses with knowledge of the conspiracy. Based on these interviews, the initial PSR determined that Mr. Hopper had a base offense level of 36, which corresponds to offenses involving "at least 1.5 kilograms but less than 4.5 kilograms of ice."[31] Specifically, according to the PSR, the conspiracy involved 1.968 kilograms of ice methamphetamine.

To calculate Mr. Hopper's relevant conduct, the PSR totaled the drug amounts described in four separate interviews with other participants in the conspiracy. In particular:

On August 24, 2016, Lucas Holland participat-

---

[29] *Id.* at 21.

[30] R.72 at 1.

[31] R.81 ¶ 28.

ed in an interview with investigating agents. Holland divulged that he received four ounces of ice every day for a month from Randall Riley; of the four ounces, he would give the defendant one ounce on each occasion. (**30 ounces = 850 grams**)[32]

On February 14, 2017, Randall Riley was interviewed by investigating agents. Riley stated that from January through March, he sold one ounce of ice every day to the defendant for $1,100. (**28 days [February] x 28.35 grams = 793 grams**) [33]

On May 4, 2017, Erin Wright participated in an interview with agents. … Wright stated she traveled with Hopper on ten occasions to pick up ice from Gary Mims in Cape Girardeau. She stated on average, they would obtain an ounce of ice per visit (**10 ounces or 283.5 grams of ice**). [34]

On July 19, 2017, Erin Wright was interview[ed] by investigating agents. According to Wright, the defendant purchased ice from Robert Weir from October or November 2015 until Weir was arrested in March 2016. Wright estimated that the defendant would purchase

---

[32] *Id.* ¶ 12.

[33] *Id.* ¶ 14.

[34] *Id.* ¶ 19.

> 3.5 grams to 28 grams per week, conservative-
> ly. (**12 weeks [December—February] x 3.5
> grams = 42 grams**)[35]

The PSR explained that Mr. Hopper's "relevant conduct is outlined in bold above and involves the amounts obtained by the defendant, which he then distributed to others."[36] Further, the PSR noted that "[t]he amount of ice that the defendant distributed was not counted to avoid double counting."[37] Adding the drug amounts described above, the PSR totaled Mr. Hopper's relevant conduct to be 1.968 kilograms of ice methamphetamine.

The initial PSR awarded Mr. Hopper a two-level sentence reduction for acceptance of responsibility. Based on a total offense level of 34 and a criminal history category of I, the PSR calculated a guidelines imprisonment range of 151 to 188 months. Mr. Hopper filed an objection to the initial PSR, challenging the sentence reduction for acceptance of responsibility.[38] He asserted that he had "neither denied, nor admitted, any … involvement" in the conspiracy.[39] He also

---

[35] *Id.* ¶ 20.

[36] *Id.* ¶ 21.

[37] *Id.*

[38] Mr. Hopper's trial counsel acknowledged that this objection was highly unusual. *See* R.82 at 1 ("This marks the first instance in Undersigned Counsel's career in which he levels an objection on behalf of a client that operates to raise the applicable advisory guidelines range. Thus, it should be noted that this objection is filed with Defendant Rex Hopper's consent and at his direction.").

[39] *Id.*

stated that he "underst[ood] that this objection [would] doom any opportunity he might have at the two-level [acceptance of responsibility] reduction."[40] He submitted that, as a result, his total offense level was 36 and the proper guidelines range was 188 to 235 months' imprisonment.

Consequently, the probation office filed a revised PSR, which removed the acceptance of responsibility reduction. Based on a total offense level of 36 and a criminal history category of I, the revised PSR calculated a guidelines imprisonment range of 188 to 235 months. The Government filed an objection to the revised PSR, contending that Mr. Hopper was subject to a two-level sentence enhancement for maintaining a residence for the purpose of distributing methamphetamine. *See* U.S.S.G. § 2D1.1(b)(12).

Accordingly, the probation office filed a second revised PSR, adopting the Government's recommendation that Mr. Hopper was subject to the two-level sentence enhancement for maintaining a drug premises. Based on a total offense level of 38 and a criminal history category of I, the second revised PSR calculated a guidelines imprisonment range of 235 to 293 months. Mr. Hopper filed an objection to the second revised PSR, challenging the application of the drug premises enhancement. He maintained that, consistent with the first revised PSR, his total offense level was 36 and his guidelines imprisonment range was 188 to 235 months.

The district court conducted a hearing to impose its sentence. At the outset, the court asked whether there were any objections to the PSR other than Mr. Hopper's challenge to

---

[40] *Id.*

the application of the drug premises enhancement. Both sets of counsel stated that there were not. The court then turned to the sentence enhancement.

The Government introduced additional testimony from Wright, Mr. Hopper's former girlfriend. She testified that she had lived with Mr. Hopper at his Creal Springs home from about October 2015 until May 2017. She acknowledged that, during this time, she saw methamphetamine at the residence. She elaborated that "[i]t was always there" and that she saw drugs in the home "[p]retty much every day."[41] Wright testified that after Mr. Hopper obtained methamphetamine from others, he brought it back to the Creal Springs house. She further stated that she saw Mr. Hopper distribute methamphetamine from the residence. She said that this occurred "[t]hroughout the week" and that "each week there was some sort of activity going on" involving methamphetamine.[42] Wright acknowledged that Mr. Hopper collected money from individuals who bought methamphetamine at his home. She testified that he had drug scales at the house, which he used "[t]o weigh out the product."[43] She estimated that, while she lived with him, Mr. Hopper distributed methamphetamine from his residence approximately "[w]eekly."[44] She added, however, that toward the end of

---

[41] R.125 at 8.

[42] *Id.* at 9.

[43] *Id.*

[44] *Id.* at 10.

their time living together, Mr. Hopper's drug selling diminished and he was "just using."[45]

The court inquired what Mr. Hopper did for a living. Wright explained that Mr. Hopper had received a monetary settlement after working in the coal mines. Subsequently, he had a "side business" buying and selling cars, and he dealt drugs.[46] Wright acknowledged that Mr. Hopper did not "officially work."[47]

Based on the testimony introduced at trial and at sentencing, the court concluded that Mr. Hopper stored methamphetamine at and distributed it from the Creal Springs residence. Given Wright's testimony that this occurred weekly over an extended period of time, the court determined that the distribution was "more than just incidental or collateral."[48] Accordingly, the court overruled Mr. Hopper's objection and concluded that he was subject to the two-level enhancement for maintaining a residence for the purpose of distributing methamphetamine.

Noting that there were no other objections, the court adopted the findings of the PSR as the findings of the court. This included the finding that the conspiracy involved between 1.5 and 4.5 kilograms of ice methamphetamine, specifically 1.968 kilograms, which corresponded to a base offense level of 36. Given its conclusion regarding the two-level

---

[45] *Id.* at 24.

[46] *Id.* at 32.

[47] *Id.*

[48] *Id.* at 41.

drug premises enhancement, the court determined that Mr. Hopper had a total offense level of 38. With a criminal history category of I, the court concluded that his corresponding guidelines imprisonment range was 235 to 293 months.

Neither party objected to the court's guideline range findings. The Government recommended a sentence near or at the top of the guidelines range, while counsel for Mr. Hopper recommended a sentence of 188 months. Based on the information in the PSR, the factors set forth in 18 U.S.C. § 3553(a), and the arguments of Mr. Hopper's counsel, the court sentenced Mr. Hopper at the bottom of the guidelines range to 235 months' imprisonment, followed by four years of supervised release. At the conclusion of the hearing, the court asked defense counsel, "Are there any other arguments I have not considered?"[49] Counsel for Mr. Hopper responded that there were not. Following the entry of final judgment, Mr. Hopper filed a timely notice of appeal.

## II.

## DISCUSSION

Mr. Hopper raises four arguments on appeal. First, he asserts that the evidence presented at trial was insufficient to support his conviction for conspiracy to distribute methamphetamine and that, even if the Government established the existence of multiple, smaller conspiracies, there was a fatal variance between the single, overarching conspiracy alleged in the indictment and the Government's proof at trial. Sec-

---

[49] *Id.* at 59.

ond, he contends that the district court erred when it denied his motion for disclosure of the cooperating witnesses' proffer letters. Third, he challenges the district court's application of a two-level sentence enhancement for maintaining a drug premises. Finally, he submits that the district court erred in calculating his guidelines range because, in determining Mr. Hopper's relevant conduct, it double-counted the drug transactions described by Holland and Riley.

## A.

### 1.

We begin with Mr. Hopper's attack on the sufficiency of the evidence. *United States v. Douglas*, 874 F.2d 1145, 1150 (7th Cir. 1989), *abrogated on other grounds by United States v. Durrive*, 902 F.2d 1221 (7th Cir. 1990).[50] He contends that there was insufficient evidence to support his conviction for conspiracy to distribute methamphetamine because the Government proved only a series of buyer-seller relationships. He preserved this argument by moving for a judgment of acquittal at the close of all evidence, so we review

---

[50] In *United States v. Douglas*, 874 F.2d 1145 (7th Cir. 1989), *abrogated on other grounds by United States v. Durrive*, 902 F.2d 1221 (7th Cir. 1990), we adopted a "policy" of "routinely addressing evidentiary sufficiency in criminal cases when a defendant presents the issue on appeal." *Id.* at 1150. We reasoned that "[i]f in fact insufficient evidence is presented at a first trial, a retrial, on any basis, ordinarily may be a wasted endeavor." *Id.* By contrast, if we find "that the evidence is sufficient to sustain a conviction, but reverse based on trial error, a retrial" is proper. *Id.* Accordingly, to conserve the "scarce and costly resources" of the courts and the parties, we address a challenge to the sufficiency of the evidence first. *Id.*

his claim de novo. *United States v. Claybrooks*, 729 F.3d 699, 704 (7th Cir. 2013).

A defendant's burden in showing the evidence was insufficient to support a conviction is indeed a high one. *See United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008). In attempting to describe that burden, we often have said that the burden is a direct function of the strength of the Government's case. *See United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019); *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013). Because "[w]e accord great deference to jury verdicts," *United States v. Brown*, 726 F.3d 993, 1004–05 (7th Cir. 2013) (internal quotation marks omitted), "[w]e will overturn a conviction on sufficiency-of-the-evidence grounds only if no rational jury could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010). "In making this determination, we view all evidence and draw all reasonable inferences in the light most favorable to the prosecution." *Id.* *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979), *superseded on other grounds by statute*, Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) (stating standard of proof in criminal cases). *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252–53 (1986) (comparing methodology in adjudicating a motion for judgment of acquittal in a criminal case with a motion for summary judgment in a civil case).

"To convict a defendant of conspiracy, the government must prove that (1) two or more people agreed to commit an unlawful act, and (2) the defendant knowingly and intentionally joined in the agreement." *Johnson*, 592 F.3d at 754. "For a drug-distribution conspiracy, the government must

prove that the defendant knowingly agreed—either implicit-
ly or explicitly—with someone else to distribute drugs."
*Claybrooks*, 729 F.3d at 704 (internal quotation marks omit-
ted).

Our cases "have underscored that ordinary drug transac-
tions do not entail or reflect a conspiracy, for the buyer's on-
ly purpose is to buy and the seller's only purpose is to sell:
the buyer and seller lack a *shared* criminal goal." *United
States v. Neal*, 907 F.3d 511, 515 (7th Cir. 2018) (per curiam).
In other words, "evidence of a buyer-seller relationship,
standing alone, is insufficient to support a conspiracy con-
viction." *United States v. Townsend*, 924 F.2d 1385, 1394 (7th
Cir. 1991). Instead, we require "[e]vidence of an agreement
to advance *further* distribution—beyond the initial transac-
tion." *United States v. Pulgar*, 789 F.3d 807, 812 (7th Cir. 2015).
"The government may prove the existence of this agreement
through circumstantial evidence." *Claybrooks*, 729 F.3d at
704–05.

A "nonexhaustive list of characteristics that strongly dis-
tinguish a conspiracy from a buyer-seller relationship" in-
cludes:

> "sales on credit or consignment, an agreement
> to look for other customers, a payment of
> commission on sales, an indication that one
> party advised the other on the conduct of the
> other's business, or an agreement to warn of
> future threats to each other's business stem-
> ming from competitors or law enforcement au-
> thorities."

*United States v. Pereira*, 783 F.3d 700, 704 (7th Cir. 2015) (quoting *Johnson*, 592 F.3d at 755–56). "We employ a totality-of-the-circumstances approach in these cases," "'tak[ing] into account all the evidence surrounding the alleged conspiracy and mak[ing] a holistic assessment of whether the jury reached a reasonable verdict.'" *Pulgar*, 789 F.3d at 813 (quoting *Brown*, 726 F.3d at 1002).

In this case, the Government presented sufficient evidence for a reasonable jury to conclude that Mr. Hopper entered an agreement to distribute methamphetamine in southern Illinois. Our conclusion is supported by evidence that Mr. Hopper sold methamphetamine on credit, or "fronted" it, to his co-conspirators and that he engaged in pooling arrangements with other co-conspirators to purchase large quantities of methamphetamine for further distribution.

Evidence of repeated, "fronted" transactions can be compelling circumstantial evidence of an agreement to distribute drugs because it demonstrates that the defendant "had knowingly thrown his lot in" with other members of the conspiracy. *United States v. Dortch*, 5 F.3d 1056, 1070 (7th Cir. 1993) (internal quotation marks omitted). In a fronting arrangement, "the seller becomes the buyer's creditor, adding a dimension to the relationship that goes beyond a spot sale for cash." *United States v. Colon*, 549 F.3d 565, 569 (7th Cir. 2008). Such a relationship indicates that the defendant "had a keen interest" in his co-conspirators' "success at reselling" the drugs. *Dortch*, 5 F.3d at 1070. Although "not all credit sales can support an inference that there was an agreement to distribute," "when a credit sale is coupled with certain characteristics inherent in an ongoing wholesale buyer-seller

relationship—i.e., large quantities of drugs, repeat purchases[,] or some other enduring arrangement—the credit sale becomes sufficient evidence to distinguish a conspiracy from a nonconspiratorial buyer-seller relationship." *Johnson*, 592 F.3d at 756 n.5 (internal quotation marks omitted).

At Mr. Hopper's trial, the Government presented evidence that he fronted methamphetamine to Williams, Shuman, and Karnes. Williams testified that he obtained about one to two ounces of ice methamphetamine from Mr. Hopper "[o]ff and on" for about one year.[51] He stated that sometimes, he bought the drugs outright, while other times, Mr. Hopper provided the drugs to him "on credit," or on a "front."[52] Williams explained that, in this fronting arrangement, Mr. Hopper provided him a quantity of drugs, some of which Williams sold to others in order to pay Mr. Hopper back for previously fronted drugs. Williams further testified that occasionally, Mr. Hopper called Williams and asked him to bring customers who owed Mr. Hopper money to Mr. Hopper's house to settle their debt. Williams explained that he helped Mr. Hopper collect money from his customers because Williams "was selling drugs for him" and "to help him out in his drug business."[53]

Shuman also testified that he bought drugs from Mr. Hopper "on a front."[54] In early 2016, the quantities he

---

[51] R.118 at 59.

[52] *Id.* at 61 (internal quotation marks omitted).

[53] *Id.* at 64.

[54] R.123 at 26.

purchased increased from grams to ounces of methamphetamine. The two had an arrangement in which Mr. Hopper placed methamphetamine for Shuman in Mr. Hopper's garage. Shuman retrieved the drugs from the garage and left in their place the money he owed Mr. Hopper for previously fronted methamphetamine. Shuman further testified that he drove Mr. Hopper around southern Illinois to deliver methamphetamine to his customers. He also described two occasions on which he drove Mr. Hopper to Jackson, Missouri, to obtain methamphetamine. When they returned home, Mr. Hopper gave Shuman drugs in return for driving.

Similarly, Peyton testified that Karnes, her former boyfriend, obtained methamphetamine from Mr. Hopper "[o]n a front," in which he would sell drugs to others in order to pay Mr. Hopper back for the drugs he had previously obtained.[55] She stated that during the summer of 2016, Mr. Hopper provided Karnes three to five "8-balls," or 3.5 gram quantities of ice methamphetamine, several times a week.[56] She added that on occasion, Mr. Hopper sent Williams to deliver drugs to Karnes.

These fronting arrangements are "substantial evidence" that Mr. Hopper "expected and encouraged" Williams, Shuman, and Karnes "to redistribute the drugs he had provided." *United States v. Avila*, 557 F.3d 809, 816 (7th Cir. 2009). Because Mr. Hopper expected to be repaid based on sales of previously fronted methamphetamine, "he was dependent upon the further resale of the drugs to make a prof-

---

[55] R.118 at 90.

[56] *Id.* at 89.

it." *Id.*; *see also United States v. Kozinski*, 16 F.3d 795, 808–09 (7th Cir. 1994) (reasoning that evidence that co-conspirator sold cocaine to the defendant "on credit" indicated that he "took a stake in her business—he received payment after, and as a result of, her resale"). Mr. Hopper also "demonstrated a high level of trust and confidence in" Shuman, Williams, and Karnes, given that he provided them "with large quantities of drugs without requiring any payment until the drugs were resold." *Avila*, 557 F.3d at 816.[57]

That Mr. Hopper "fronted" methamphetamine to Williams, Shuman, and Karnes repeatedly, in large quantities, over an extended period of time makes clear that these activities were more than mere buyer-seller relationships. *See Brown*, 726 F.3d at 1006 (permitting "an inference of conspiracy" based on evidence of "repeated transactions, in wholesale quantities, on credit"). These "factors suggest standardized transactions and lower transaction costs in the business as well as a continuing relationship." *Kozinski*, 16 F.3d at 809; *see also Dortch*, 5 F.3d at 1070 (reasoning that evidence of "multiple transactions over a prolonged period of time" suggested "that transaction costs … were quite low, which counsels a finding of conspiracy"). Evidence that Williams and Shuman drove Mr. Hopper around southern Illinois to deliver drugs to his customers and that Mr. Hopper sent Williams to deliver drugs on his own or to pick up customers who owed Mr. Hopper money reinforces that these rela-

---

[57] *Cf. United States v. Colon*, 549 F.3d 565, 569 (7th Cir. 2008) (noting "[t]he mutual trust in this case was less than it would have been had [a co-conspirator] 'fronted' cocaine to the defendant (a factor mentioned in almost all the cases) rather than being paid in cash at the time of sale").

tionships were in furtherance of Mr. Hopper's distribution of drugs. Based on this evidence, a jury could rationally conclude that Mr. Hopper conspired to distribute methamphetamine. *See Pereira*, 783 F.3d at 704–05.

The Government also presented considerable testimony establishing that Mr. Hopper pooled his resources with other members of the conspiracy to obtain methamphetamine at a reduced cost from out-of-state sources. This is circumstantial evidence of an agreement to distribute drugs because, by "put[ting] their money and transportation resources together for an extended period of time," the co-conspirators "thereby ha[d] a stake in each other's success, and kn[ew] that the others intended to resell" the drugs. *United States v. Harris*, 567 F.3d 846, 851 (7th Cir. 2009) (citation omitted); *see also United States v. Lomax*, 816 F.3d 468, 475 (7th Cir. 2016) (holding that "[a] reasonable jury could have found that the shared supplier, funds, and product indicated an agreement" to sell drugs). Based on such evidence, we upheld the defendant's conspiracy conviction in *United States v. Haywood*, 324 F.3d 514 (7th Cir. 2003), reasoning that:

> [I]n driving to Chicago together, then bringing the drugs back … and splitting them up upon their return, Haywood and Jackson had a standardized way of doing business; they had a continuing relationship, making three trips together to Chicago and talking about making one to Oklahoma; and they both knew that the cocaine would be resold.

*Id.* at 517. Similarly, in *Harris,* we held that there was sufficient evidence of a conspiracy to distribute drugs where the defendant "pooled his money with that of … the other al-

leged co-conspirators to buy larger amounts of crack cocaine from outside the state for resale." 567 F.3d at 851.

In this case, Holland, Riley, and Weir testified that, together with Mr. Hopper, they pooled their money and transportation resources over approximately a month-long period to purchase methamphetamine from a source in Cape Girardeau, Missouri. Mr. Hopper, Weir, or both brought the money to Riley's home, where Holland also lived. Holland and Riley drove to Missouri to obtain the drugs. When they returned, the group met at either Riley's home or Mr. Hopper's home to divide up the drugs. The group pooled their money multiple times per week to purchase four ounces of methamphetamine at a time, which they divided into equal, one-ounce shares upon return to Illinois.

Evidence that Mr. Hopper pooled funds, shared suppliers, and coordinated transport out of state with Holland, Riley, and Weir, underscored a common goal between them to distribute methamphetamine.[58] That this pooling arrangement involved multiple transactions per week over an ex-

---

[58] *United States v. Lomax*, 816 F.3d 468, 474 (7th Cir. 2016) (upholding conspiracy conviction based on testimony that Lomax and his co-conspirator "shared customers, a supplier, and heroin, and pooled funds"); *United States v. Harris*, 567 F.3d 846, 851 (7th Cir. 2009) (reasoning that evidence that the co-conspirators "pooled their money and shared rides to buy cheaper crack" from outside the state "mean[t] that each could earn more if the others succeeded"); *United States v. Haywood*, 324 F.3d 514, 517 (7th Cir. 2003) (affirming conspiracy conviction where Haywood and his co-conspirator "pooled their money and shared rides to Chicago in order to buy inexpensive crack, meaning that each could run a cheaper operation—and earn higher profits—if the other succeeded").

tended period of time reinforces the conclusion that Mr. Hopper had entered an agreement to distribute drugs in southern Illinois. Thus, the jury had ample evidence, based on the "fronted" transactions and the pooling arrangement, to convict Mr. Hopper of conspiring to distribute methamphetamine.

**2.**

Mr. Hopper also submits that even if the Government presented some evidence of conspiracy, we must vacate his conviction "because of the variance between the indictment (alleging a single, overarching conspiracy) and the proof at trial (showing, at most, smaller sub-conspiracies), which prejudiced Mr. Hopper."[59] We conclude that there was no fatal variance in this case.

At the close of all evidence, Mr. Hopper's trial counsel moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Rule 29 requires the court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Mr. Hopper's counsel did not articulate the grounds for his motion and, in denying the motion, the district court ruled only that the Government had presented sufficient evidence of the charge against Mr. Hopper.[60] Because Mr. Hopper's counsel did not raise the possibility of a fatal variance in the district court, that court did not have the opportunity to address this claim.

---

[59] Appellant's Br. 17–18.

[60] *See* R.123 at 55.

Therefore, we review his variance claim for plain error only. *United States v. Womack*, 496 F.3d 791, 794 (7th Cir. 2007).[61]

"A variance arises when the facts proved by the government at trial differ from those alleged in the indictment." *Avila*, 557 F.3d at 815 (quoting *United States v. Stigler*, 413 F.3d 588, 592 (7th Cir. 2005)). We treat a conspiracy variance claim "as an attack on the sufficiency of the evidence." *United States v. Handlin*, 366 F.3d 584, 589 (7th Cir. 2004). Although we treat the question of variance as an attack on the sufficiency of the evidence, a party must raise with specificity the issue of variance. A timely objection affords the district court the opportunity to address the issue and undertake curative steps. *See United States v Pierson*, 925 F.3d 913, 921–22 (7th Cir. 2019). To prevail on his claim, Mr. Hopper must show both that (1) "no rational trier of fact could have found that the evidence at trial proved a single conspiracy" and (2) "the variance was prejudicial." *United States v. DeKelaita*, 875 F.3d 855, 858 (7th Cir. 2017). "Even if the evidence arguably established multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment." *United States v. Williams*, 272 F.3d 845, 862 (7th Cir. 2001).

Mr. Hopper contends that there was a variance between the Government's proof at trial and the conspiracy alleged in

---

[61] Like the defendant in *United States v. Womack*, 496 F.3d 791, 795 (7th Cir. 2007), Mr. Holmes did not ask for a jury instruction on multiple conspiracies.

the indictment because the Government "failed to tie togeth-er the disparate purposes of Mr. Hopper's alleged co-conspirators" to demonstrate a single conspiracy.[62] He submits that this variance prejudiced him at trial and at sentencing.

To evaluate Mr. Hopper's variance claim, "we turn to the indictment first and then to the proof at trial." *Id.* at 863. The indictment alleged that from about January 2015 through May 31, 2017, in Williamson and Franklin Counties, in the Southern District of Illinois, "and elsewhere," Mr. Hopper conspired "with other persons known and unknown" to distribute methamphetamine.[63] As detailed above, at trial, the Government presented substantial evidence that Mr. Hopper entered an agreement to distribute methamphetamine in southern Illinois. It is sufficient that the purpose of the conspiracy "was simply to distribute narcotics," and that "each co-conspirator agreed to advance" that goal. *United States v. Martin*, 618 F.3d 705, 736–37 (7th Cir. 2010). Based on the evidence that Mr. Hopper "fronted" methamphetamine to Williams, Shuman, and Karnes for further distribution and that he engaged in a pooling arrangement with Holland, Riley, and Weir to obtain methamphetamine at a low cost for resale, a rational jury could have found that Mr. Hopper joined the single conspiracy alleged in the indictment. Because "[t]he key to proving a conspiracy is that the defendant joined [an] *agreement*, not [a] group," *Avila*, 557 F.3d at 816, any failure to identify the connection between Mr. Hopper's

---

[62] Appellant's Br. 34.

[63] R.32 at 1.

co-conspirators did not amount to a material variance. *See, e.g., Williams*, 272 F.3d at 863 (concluding there was no material variance where there was sufficient evidence "for the jury to conclude that a number of people had an agreement to distribute drugs in East St. Louis, and that Williams joined that agreement").

In any event, Mr. Hopper suffered no prejudice as a result of the alleged variance. First, he contends that the variance prejudiced him at trial because his counsel "was unable to adequately prepare his defense because the government did not define the scope of the alleged conspiracy until closing arguments."[64] But "[i]t is the grand jury's statement of the existence of the conspiracy agreement rather than the identity of those who agree which places the defendant on notice of the charge he must be prepared to meet." *Townsend*, 924 F.2d at 1389 (internal quotation marks omitted). The Government's evidence at trial demonstrated that Mr. Hopper joined others in an agreement to distribute methamphetamine in southern Illinois. Mr. Hopper had sufficient notice of the charged conspiracy and the evidence presented at trial.[65]

Next, Mr. Hopper submits that "[t]he indictment and the government's arguments at trial were so broad as to make it

---

[64] Appellant's Br. 36.

[65] *See, e.g., United States v. Hardimon*, 329 F. App'x 660, 665 (7th Cir. 2009) (unpublished) (determining that there was no variance and explaining that "the indictment's allegation of a conspiracy agreement alone was sufficient notice of the charge that Hardimon needed to be prepared to meet, and the indictment was not required to name all those who participated in the conspiracy").

impossible for Mr. Hopper to invoke his Fifth Amendment right against double jeopardy" in a subsequent prosecution.[66] He stresses that the record does not reveal the scope of the conspiracy, his role in it, or "with whom the jury convicted him of conspiring."[67] If we uphold his conviction "on the basis that some sub-conspiracy existed," he posits, the Government could indict him "for any other act within that time frame even though he had already been found guilty by the jury on the charged indictment."[68]

We have held that, despite a variance between the indictment and the proof at trial, we had "no difficulty in judging the scope of the conviction for double jeopardy purposes" where the indictment alleged a specific crime, "during a finite interval," "involved a particular perpetrator," and "alleged specific misconduct by the perpetrator." *United States v. Ratliff-White*, 493 F.3d 812, 822, 824 (7th Cir. 2007) (upholding defendant's mail fraud conviction because defendant was not prejudiced by the variance between the indictment, "which pinpointed a particular step in the payment process" of her alleged fraud, "and the proof at trial, which established another"). In the same way, here, the indictment alleged a specific crime (conspiracy to distribute methamphetamine), during a finite interval (about January 2015 through about May 31, 2017), involving a particular perpetrator (Mr. Hopper and "other persons known and unknown"), and specific misconduct by the perpetrator (know-

---

[66] Appellant's Br. 38.

[67] *Id.*

[68] *Id.* at 38–39.

ingly conspiring to distribute a mixture and substance containing methamphetamine).[69] The scope of Mr. Hopper's conviction is sufficiently specific to avoid a future double jeopardy problem.

He further contends that the alleged variance prejudiced him at trial because the jury was confused about the instructions regarding the scope of the conspiracy. Evidence of multiple conspiracies may pose "a danger of 'spillover' prejudice" where multiple defendants are tried together and the jury hears incriminating evidence relevant against only some, but not all, of the defendants. *Townsend*, 924 F.2d at 1411. Because Mr. Hopper was tried alone, however, this concern was not implicated. *See, e.g.*, *United States v. Curtis*, 37 F.3d 301, 306 (7th Cir. 1994) (holding that "there could be no prejudice" where "Curtis was the only person on trial, thus eliminating the customary concern with jury confusion resulting from the 'spillover' effect associated with simultaneously trying multiple defendants with various connections to the purported scheme").

Additionally, Mr. Hopper asserts that the variance prejudiced him at sentencing because it "improperly increased the quantity of drugs attributed to him."[70] As we have stated, however, there was ample evidence to support Mr. Hopper's conspiracy conviction, including but not limited to the pooling arrangement he participated in with Holland, Riley, and Weir. Moreover, the PSR calculated Mr. Hopper's relevant conduct based on "the amounts obtained by the defendant,

---

[69] R.32 at 1.

[70] Appellant's Br. 39.

which he then distributed to others."[71] Because the district court did not sentence Mr. Hopper based on drug transactions not related to the conspiracy in which he participated, *see Townsend*, 924 F.2d at 1412 (determining there was no prejudice where "none of the defendants [could] claim that their sentences were increased on the basis of drug transactions that were not attributable to the limited conspiracies in which they participated"), or based on drug quantities sold by his co-conspirators that were within the scope of the conspiracy, *see Avila*, 557 F.3d at 819 (concluding there was no prejudice where the defendant's sentence was based on drugs he supplied to others, not "the quantities of drugs that were seized from the entire drug organization"), he did not suffer prejudice at sentencing.

## B.

### 1.

Mr. Hopper next submits that the district court erred when it ruled that the Government was not required to disclose the proffer letters of its cooperating witnesses. He asserts that the court erroneously "based its decision solely on *Brady*[72] and *Giglio*,[73] and thus did not recognize" that Federal Rule of Criminal Procedure 16 "is an independent and more expansive basis for disclosure of proffer letters."[74] Mr. Hopper's trial counsel never filed a request under Rule

---

[71] R.94 ¶ 21.

[72] *Brady v. Maryland*, 373 U.S. 83 (1963).

[73] *Giglio v. United States*, 405 U.S. 150 (1972).

[74] Appellant's Br. 14.

16 for disclosure of the proffer letters. Nor did counsel suggest to the district court, during the hearing on his motion or otherwise, that Rule 16 might be a basis for disclosure. That counsel moved for disclosure of the proffer letters and argued that the court should disregard our decision in *United States v. Weidenburner*, 550 F. App'x 298 (7th Cir. 2013) (unpublished), was not sufficient to preserve the instant argument under Rule 16.[75] Because there is no evidence in the record that Mr. Hopper intended to relinquish this argument, however, we conclude that he has forfeited, not waived, his request for disclosure under Rule 16. *United States v. Brodie*, 507 F.3d 527, 530 (7th Cir. 2007) (explaining that "[f]orfeiture occurs when a defendant negligently fails to assert a right in a timely fashion").

Rule 16, which governs discovery and inspection, provides in relevant part that:

> Upon a defendant's request, the government must permit the defendant to inspect and to

---

[75] *Cf. United States v. McMillian*, 786 F.3d 630, 636 (7th Cir. 2015) (defendant forfeited argument that his arrest was unlawful because his motion to suppress challenged only the protective sweep of his home, not his arrest); *United States v. Kelly*, 772 F.3d 1072, 1078 (7th Cir. 2014) (defendant forfeited argument that the warrant application failed to establish probable cause because his motion to suppress argued only that the warrant lacked sufficient particularity in the description of the place to be searched); *United States v. Murdock*, 491 F.3d 694, 698 (7th Cir. 2007) (defendant forfeited argument that his waiver of his Fifth Amendment rights and subsequent confession were involuntary due to the coercive conditions of his confinement because, in the district court, he argued only that his confession was involuntary because the police did not administer *Miranda* warnings).

> copy or photograph books, papers, documents,
> data, photographs, tangible objects, buildings
> or places, or copies or portions of any of these
> items, if the item is within the government's
> possession, custody, or control and … the item
> is material to preparing the defense.

Fed. R. Crim. P. 16(a)(1)(E).

Relatedly, Rule 12 provides that certain motions, including a request for "discovery under Rule 16," "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Under this Rule, "[t]he court may … set a deadline for the parties to make pretrial motions," and if no deadline is set, then "the deadline is the start of trial." Fed. R. Crim. P. 12(c)(1). "If a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely." Fed. R. Crim. P. 12(c)(3). "But a court may consider the defense, objection, or request if the party shows good cause." *Id.*

Rule 12 thus "imposes an antecedent good-cause requirement when a defendant fails to file a timely motion." *United States v. McMillian*, 786 F.3d 630, 636 (7th Cir. 2015). In other words, "if a defendant fails to raise a[n] … argument below—even if he does so under circumstances that suggest a forfeiture—we cannot proceed directly to a review of the district court's actions for plain error." *United States v. Kelly*, 772 F.3d 1072, 1079 (7th Cir. 2014). Instead, we first must ask whether there was good cause for the failure. *United States v. Johnson*, 415 F.3d 728, 730–31 (7th Cir. 2005).

Mr. Hopper offers no explanation for his trial counsel's failure to request disclosure of the proffer letters under Rule 16 or to otherwise assert Rule 16 as a basis for disclosure of the letters before the district court. Further, his counsel made no request for relief based on good cause before the district court or in this court. Absent a showing of good cause as required by Rule 12, his claim is not subject to further review. *United States v. Daniels*, 803 F.3d 335, 352 (7th Cir. 2015); *United States v. Hargrove*, 508 F.3d 445, 450 (7th Cir. 2007).[76]

**2.**

Mr. Hopper further contends that "the district court erred in presuming that proffer letters are never" required to be disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963), or *Giglio v. United States*, 405 U.S. 150 (1972).[77] We review the district court's determination that the proffer letters need not be disclosed for an abuse of discretion. *United States v. Jumah*, 599 F.3d 799, 807 (7th Cir. 2010).

At the hearing on Mr. Hopper's motion, the discussion centered on our decision in *Weidenburner*, where we held that proffer letters "are not *Giglio* material or Jencks Act[78] statements." 550 F. App'x at 304. In that case, the defendant moved for a new trial based on the Government's assertion

---

[76] We note in passing that Mr. Hopper's counsel had the information contained in the proffer letters, even though he did not have the letters themselves. He also was permitted to cross examine the witness about the proffer process. His client therefore suffered no prejudice from the absence of the letters.

[77] Appellant's Br. 16.

[78] 18 U.S.C. § 3500.

that it could not locate copies of the proffer letters for two codefendants who testified against Weidenburner. *Id.* Neither witness disputed the existence of the proffer letters, and Weidenburner received copies of both witnesses' plea agreements. *Id.* Consequently, we rejected Weidenburner's claim of nondisclosure as frivolous. *Id.* Acknowledging that "*Giglio* requires disclosure of inducements for a witness[]'s testimony," we reasoned that "the prosecutor fulfilled that obligation by producing the plea agreements, which describe[d] the benefits [the witnesses] would receive for cooperating." *Id.* Because "[t]he proffer letters were preliminary to the resulting plea agreements," we concluded that "*Giglio* was satisfied by disclosure of the plea agreements." *Id.* Further, we determined that "the Jencks Act [wa]s irrelevant" because "[t]he proffer letters were statements of the prosecutor who wrote them," not "factual narrative[s] useful for impeachment." *Id.* at 305 (internal quotation marks omitted).[79]

---

[79] At least one of our sister circuits also has held that "the government satisfied its obligations" by disclosing a cooperating witness's plea agreement to the defense. *United States v. Santisteban*, 501 F.3d 873, 880 (8th Cir. 2007). In *Santisteban*, the defendant alleged that the Government's non-disclosure of the proffer letters sent to a cooperating witness "violated his due process right to receive exculpatory or impeachment evidence." *Id.* Because "the government had already provided [the witness]'s plea agreement," the district court "declined to compel the production" of the proffer letters. *Id.* The Eighth Circuit held that there was no due process violation. *Id.* "Regardless of any preliminary proffer agreements," the court reasoned, "the formal plea agreement governed [the witness]'s cooperation, and it provided the jury with a sufficient basis for judging the credibility of [his] testimony at trial." *Id.* The court concluded that "[t]he terms of the proffer letters were not material to the defense." *Id.*

In this case, the Government disclosed the cooperating witnesses' plea agreements, which superseded the proffer letters and outlined the terms of the witnesses' cooperation. The agreements provided a sufficient basis for Mr. Hopper's counsel to impeach the Government's witnesses and for the jury to assess the credibility of those witnesses. Therefore, the district court did not abuse its discretion when it denied Mr. Hopper's motion for disclosure of the proffer letters.

## C.

Next, Mr. Hopper challenges the district court's finding that he was subject to a two-level sentence enhancement based on evidence that he maintained his Creal Springs residence for the purpose of distributing methamphetamine. Mr. Hopper preserved this challenge by filing an objection to the application of the enhancement in the district court. Therefore, "we review the district court's application of the U.S. Sentencing Guidelines *de novo* and its underlying factual findings for clear error." *United States v. Flores-Olague*, 717 F.3d 526, 530 (7th Cir. 2013).

The guidelines provide for a two-level sentence enhancement "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). This includes "storage of a controlled substance for the purpose of distribution." *Id.* cmt. n.17. The application notes clarify that "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id.* Because it is undisputed that Mr. Hopper "maintained" the

Creal Springs house, which was his home, our review is limited to whether distributing methamphetamine was a "primary or principal" use of the home.

"[T]o determine whether drug distribution was a primary or incidental use, the district courts are not required to apply a simple balancing test that compares the frequency of unlawful activity at the residence with the frequency of lawful uses." *United States v. Contreras*, 874 F.3d 280, 284 (7th Cir. 2017) (per curiam). That is because "such a test would immunize every family home that is also used for drug distribution from being deemed an illegally maintained 'premises,'" since "the amount of lawful activity in a home is all but certain to exceed the amount of illegal activity." *Id.* Instead, "the sentencing court should focus on both the frequency and significance of the illicit activities." *Id.* "Neither a specific frequency nor a particular significance automatically warrants applying the enhancement." *United States v. Sanchez*, 710 F.3d 724, 731 (7th Cir. 2013), *vacated on other grounds*, *Sanchez v. United States*, 571 U.S. 801 (2013). "Rather, we consider the two in tandem and determine whether the prohibited purpose can be fairly described as a 'primary or principal' use of the premises." *Id.* Factors relevant to this analysis include "quantities dealt, customer interactions, keeping 'tools of the trade' and business records, and accepting payment." *Contreras*, 874 F.3d at 284.

First, with respect to frequency, Mr. Hopper contends that Wright's "vague and inconsistent testimony" at the sentencing hearing "was not enough" to establish the frequent use of his home to distribute drugs.[80] He further asserts that

---

[80] Appellant's Br. 45.

"the district court failed to account for [his] affirmative decision to stop using his home for drug distribution several months before the end of the charged conspiracy."[81] We conclude that these contentions are without merit.

Testimony introduced at Mr. Hopper's trial and at the sentencing hearing highlighted that he distributed methamphetamine from his home on approximately a weekly basis for the duration of the conspiracy. Wright testified that she had lived with Mr. Hopper at his Creal Springs home from about October 2015 until May 2017. During this time, methamphetamine "was always there" and she saw drugs in the home "[p]retty much every day."[82] Wright estimated that, while she lived with him, Mr. Hopper distributed methamphetamine from his residence approximately "[w]eekly."[83] She added, however, that toward the end of their time living together, Mr. Hopper's drug selling diminished and he was "just using."[84]

Similarly, Shuman testified that Mr. Hopper distributed methamphetamine to him while Shuman was living at the

---

[81] *Id.*

[82] R.125 at 8.

[83] *Id.* at 10.

[84] *Id.* at 24:8–15 ("Q. Ms. Wright, did you also add that most of the meth transactions that you were aware of occurred at Hopper's brother's house, Mark Hopper? A. I've never—I didn't say that like that. That's been taken out of context. I said that happened there, but everything was done in Creal in the very beginning, and then he slacked off, and towards the end of the relationship he was just using, he wasn't selling it.").

Creal Springs home in December 2015 and January 2016. After Shuman returned from jail in early 2016, the two had an arrangement in which Mr. Hopper placed methamphetamine for Shuman in the garage. Shuman, who was no longer living with Mr. Hopper, retrieved the drugs from the garage and left the money he owed Mr. Hopper in their place. Multiple witnesses, including Craig, Holland, and Peyton, also testified that they observed Mr. Hopper sell methamphetamine to other individuals at his home.

This evidence that Mr. Hopper stored drugs at his house and regularly distributed methamphetamine to customers there for the better part of 2016 confirms that he used the house for the purpose of drug distribution with sufficient frequency.[85] That Mr. Hopper conducted distribution activities with less frequency toward the end of the conspiracy does not undermine this conclusion.

Turning to the significance of the distribution activities, Mr. Hopper submits that "[t]he scope of drug activity at [his]

---

[85] *See, e.g.*, *United States v. Contreras*, 874 F.3d 280, 284 (7th Cir. 2017) (concluding that "evidence of eight transactions, most within a two-month period, support[ed] the courts' findings that significant deals were occurring frequently enough for the home to be deemed, in essence, a drug den for the purposes of § 2D1.1(b)(12)"); *United States v. Winfield*, 846 F.3d 241, 243 (7th Cir. 2017) (per curiam) (upholding application of enhancement based on evidence that "in the twelve weeks before the raid, [an] informant bought drugs from Winfield at his apartment four times and spotted additional drugs and drug paraphernalia during each transaction"); *United States v. Flores-Olague*, 717 F.3d 526, 533 (7th Cir. 2013) (holding that enhancement applied based on evidence that the defendant "sold and stored drugs at his home" and "did so 'on a daily basis' over a three-year period").

home was not significant enough to warrant the enhancement."[86] Again, the testimony adduced at trial and at sentencing amply demonstrated that Mr. Hopper carried on significant aspects of his distribution business from his home.

We have already observed that there was substantial testimony that Mr. Hopper stored and distributed methamphetamine at his house.[87] In this respect, Wright testified that Mr. Hopper had drug scales at the Creal Springs home, which he used "[t]o weigh out the product."[88] Further, we consider evidence of financial transactions in the home to be significant activity for the purpose of distributing drugs.[89] Here, Williams testified that, when customers owed Mr. Hopper money, Williams occasionally brought these in-

---

[86] Appellant's Br. 47.

[87] *See, e.g.*, *Contreras*, 874 F.3d at 284 (upholding application of enhancement based on "evidence that drugs were shipped to and stored at Contreras's home" and that "Contreras accepted payment for drugs at his home"). We have also recognized that keeping "tools of the trade" on the premises may indicate "that drug trafficking was the principal use of the premises." *United States v. Thomas*, 845 F.3d 824, 834 (7th Cir. 2017) (internal quotation marks omitted) (upholding application of enhancement where a "search of the home yielded a digital scale, a cutting agent, and plastic sandwich baggies with the corners cut out").

[88] R.125 at 9.

[89] *See United States v. Sanchez*, 710 F.3d 724, 732 (7th Cir. 2013), *vacated on other grounds*, *Sanchez v. United States*, 571 U.S. 801 (2013) (noting that "in conducting this large drug trade, Sanchez used his residence not only for the drop-off, storage, and pick-up of drugs, but also as a secure place to settle the financials"), *vacated on other grounds, Sanchez v. United States*, 571 U.S. 801 (2013) .

dividuals to the house to settle their debt with Mr. Hopper. Wright also acknowledged that Mr. Hopper collected money from individuals who bought methamphetamine at his home. Finally, testimony that the defendant's "only regular and reliable source of income stemmed from proceeds of drug trafficking activities" is evidence that the distribution of drugs from his home was significant to his livelihood.[90] For this reason, it is meaningful that Wright testified that Mr. Hopper had received money from a settlement and had a "side business" buying and selling cars, but that he did not "officially work."[91]

In sum, we conclude that there was evidence of frequent, significant drug distribution activities at Mr. Hopper's home. Therefore, the district court properly determined that Mr. Hopper was subject to the sentence enhancement for maintaining a drug premises.

## D.

Finally, we turn to Mr. Hopper's claim that the district court erred in determining his guidelines range because it adopted an incorrectly calculated relevant conduct finding from the PSR. He contends that most of the relevant conduct was based on drug amounts identified in interviews the

---

[90] *Flores-Olague*, 717 F.3d at 533; *see also Winfield*, 846 F.3d at 243 (noting that "Winfield at the time of his arrest was 'primarily living off proceeds from drug sales'"); *Sanchez*, 710 F.3d at 732 (reasoning that because "Sanchez had no legitimate job and no source of income beyond his drug sales," "the illicit transactions occurring at the premises were significant—in quantity, in scope, and in importance to Sanchez's livelihood").

[91] R.125 at 32.

probation office conducted with Holland and Riley. According to Mr. Hopper, in their separate interviews, Holland and Riley were actually referring to the same transactions. Thus, by including the drug amounts described in both Holland and Riley's interviews in the calculation of Mr. Hopper's relevant conduct, the district court double-counted the same set of drugs.

Mr. Hopper did not challenge the relevant conduct calculation in his objection to the initial PSR, his objection to the second revised PSR, or at the sentencing hearing. Therefore, we review his claim for plain error only. Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the [district] court's attention."). We have discretion to remedy the forfeited error provided that Mr. Hopper has satisfied the following conditions: (1) there is an error "that has not been intentionally relinquished or abandoned"; (2) the error is "plain—that is to say, clear or obvious"; (3) the error "affected the defendant's substantial rights"; and (4) the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993), *superseded on other grounds by rule*, Fed. R. Crim. P. 24(c) (1999)); *see also United States v. Pierson*, 925 F.3d 913, 919 (7th Cir. 2019).

The Supreme Court's recent jurisprudence has clarified the application of the third and fourth prongs in the context of sentencing errors. To demonstrate that the error affected his substantial rights, "in the ordinary case," the defendant must "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different."

*Molina-Martinez*, 136 S. Ct. at 1343 (internal quotation marks omitted). According to the Court, "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Id.* at 1345. "That probability is all that is needed to establish an effect on substantial rights for purposes of obtaining relief under Rule 52(b)." *Id.* at 1349. Further, "[i]n the ordinary case, … the failure to correct a plain Guidelines error that affects a defendant's substantial rights will seriously affect the fairness, integrity, and public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1911 (2018). In other words, "[a] plain Guidelines error that affects a defendant's substantial rights is precisely the type of error that ordinarily warrants relief under Rule 52(b)." *Id.* at 1907.

To calculate Mr. Hopper's relevant conduct, the PSR totaled the drug amounts described in four separate interviews with other participants in the conspiracy.[92] In particular:

> On August 24, 2016, Lucas Holland participated in an interview with investigating agents. Holland divulged that he received four ounces of ice every day for a month from Randall Riley; of the four ounces, he would give the de-

---

[92] Though the probation office revised Mr. Hopper's PSR twice before sentencing, the relevant conduct calculations did not change. For purposes of this discussion, we reference the most recent version of the report, the second revised PSR.

fendant one ounce on each occasion. (**30 ounces = 850 grams**)[93]

On February 14, 2017, Randall Riley was interviewed by investigating agents. Riley stated that from January through March, he sold one ounce of ice every day to the defendant for $1,100. (**28 days [February] x 28.35 grams = 793 grams**)[94]

On May 4, 2017, Erin Wright participated in an interview with agents. … Wright stated she traveled with Hopper on ten occasions to pick up ice from Gary Mims in Cape Girardeau. She stated on average, they would obtain an ounce of ice per visit (**10 ounces or 283.5 grams of ice**).[95]

On July 19, 2017, Erin Wright was interview[ed] by investigating agents. According to Wright, the defendant purchased ice from Robert Weir from October or November 2015 until Weir was arrested in March 2016. Wright estimated that the defendant would purchase 3.5 grams to 28 grams per week, conservatively. (**12 weeks [December—February] x 3.5 grams = 42 grams**)[96]

---

[93] R.94 ¶ 12.

[94] *Id.* ¶ 14.

[95] *Id.* ¶ 19.

[96] *Id.* ¶ 20.

The PSR explained that Mr. Hopper's "relevant conduct is outlined in bold above and involves the amounts obtained by the defendant, which he then distributed to others."[97] Further, the PSR noted that "[t]he amount of ice that the defendant distributed was not counted to avoid double counting."[98] As demonstrated by the following chart, adding the drug amounts described above, the PSR totaled Mr. Hopper's relevant conduct to be 1.9685 kilograms of ice methamphetamine.

|         | Interviewee | Drug Amount |
|---------|-------------|-------------|
|         | Holland     | 850 grams   |
|         | Riley       | 793 grams   |
|         | Wright      | 283.5 grams |
|         | Wright      | 42 grams    |
| **Total** |           | 1,968.5 grams (1.9685 kilograms) |

We agree with Mr. Hopper that the district court plainly erred in adopting the PSR's relevant conduct calculation. First, we conclude that Mr. Hopper did not "intentionally relinquish[] or abandon[]" this challenge. *Molina-Martinez*, 136 S. Ct. at 1343. Neither party objected to the relevant conduct calculation prior to or during the sentencing hearing. At sentencing, the district court adopted the findings of the PSR, including the relevant conduct calculation, without fur-

---

[97] *Id.* ¶ 21.

[98] *Id.*

ther comment. "Given the complexity" of calculating a defendant's guidelines range, "district courts sometimes make mistakes." *Rosales-Mireles*, 138 S. Ct. at 1904. Accordingly, "when a district court's sentencing of a defendant within the framework of an incorrect Guidelines range goes unnoticed by the parties as well," a defendant is "not entirely without recourse." *Id.* (internal quotation marks omitted).

Second, the error here was plain. At trial, Holland, Riley, and Weir all testified that, together with Mr. Hopper, they pooled their money over approximately a month-long period sometime between late 2015 and early 2016 to purchase methamphetamine from a source in Cape Girardeau, Missouri. Mr. Hopper, Weir, or both brought the money to Riley's home, where Holland also lived. Holland and Riley drove to Missouri to obtain the drugs. When they returned, the group met at either Riley's home or Mr. Hopper's home to divide up the drugs. Holland, Riley, and Weir all described how the group pooled their money to purchase four ounces of methamphetamine at a time, which they divided into equal, one-ounce shares.

In context of the testimony presented at trial, it is clear that Holland and Riley were describing the same pooling arrangement during their separate interviews with the probation office. The amounts attributed to Holland and Riley in the PSR differ only because Riley's more specific statements prompted the Government to use a 28-day month instead of a 30-day month to calculate the total amount of methamphetamine described. Regardless, the trial testimony consistently showed that Mr. Hopper, Holland, Riley, and Weir participated in a pooling arrangement and that following each purchase, each member of the group obtained one

ounce of methamphetamine. Because Holland and Riley were describing the same set of transactions, it was plainly erroneous to include the drug amounts described in both interviews in calculating Mr. Hopper's relevant conduct.

Third, we hold that this plain error affected Mr. Hopper's substantial rights because it increased his base offense level and his corresponding guidelines imprisonment range. *Molina-Martinez*, 136 S. Ct. at 1346 ("In most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome."). At sentencing, the district court adopted the PSR's relevant conduct calculation of 1.968 grams of ice methamphetamine, which resulted in a base offense level of 36. Applying the two-level enhancement for maintaining a residence for the purpose of distributing methamphetamine, the court calculated a total offense level of 38. With a criminal history category of I, the corresponding guidelines imprisonment range was 235 to 293 months. The court sentenced Mr. Hopper to 235 months' imprisonment, which is "conspicuous for its position as the lowest sentence within what the [d]istrict [c]ourt believed to be the applicable range." *Id.* at 1347.

If we count the drugs described by Holland and Riley only once, Mr. Hopper's base offense level falls to 34. Assuming for purposes of this calculation that the relevant month was 30 days and, consistent with the testimony at trial, that Mr. Hopper received one ounce of methamphetamine ice per transaction, the resulting drug quantity is 850 grams. Adding these 850 grams to the drug amounts described by Wright, the total quantity is only 1,175.5 grams, or 1.1755 kilograms, as shown in the following chart:

| | Interviewee | Drug Amount |
|---|---|---|
| | Holland/Riley | 850 grams |
| | Wright | 283.5 grams |
| | Wright | 42 grams |
| **Total** | | 1,175.5 grams (1.1755 kilograms) |

This amount is significantly below the 1.5-kilogram threshold that would trigger a base offense level of 36. *See* U.S.S.G. § 2D1.1(c)(2). At a base offense level of 34, applying the two-level drug premises enhancement, Mr. Hopper's total offense level would be 36. With a criminal history category of I, the corresponding guidelines imprisonment range would be 188 to 235 months. At sentencing, the district court "said nothing to suggest that it would have imposed" a sentence of 235 months "regardless of the Guidelines range." *Molina-Martinez*, 136 S. Ct. at 1348. Consequently, "there is at least a reasonable probability that the [d]istrict [c]ourt would have imposed a different sentence had it known that" a lower sentence was appropriate. *Id.*; *United States v. Adams*, 746 F.3d 734, 743 (7th Cir. 2014) ("When a district court incorrectly calculates the guideline range, we normally presume the improperly calculated guideline range influenced the judge's choice of sentence, unless he says otherwise.").

Fourth, we conclude that Mr. Hopper satisfied the last prong of the plain-error analysis. "The risk of unnecessary deprivation of liberty particularly undermines the fairness, integrity, or public reputation of judicial proceedings in the context of a plain Guidelines error because of the role the district court plays in calculating the range and the relative

ease of correcting the error." *Rosales-Mireles*, 138 S. Ct. at 1908. This conclusion is especially forceful where, as here, the error "was based on a mistake made in the presentence investigation report by the Probation Office, which works on behalf of the [d]istrict [c]ourt." *Id.* Therefore, we conclude that resentencing based on recalculation of Mr. Hopper's relevant conduct is required.[99]

The Government insists that any error in calculating Mr. Hopper's relevant conduct was harmless because the district court actually "severely undercounted" the amount of drugs attributable to Mr. Hopper.[100] According to the Government, the district court should have attributed to Mr. Hopper the entire amount purchased by Mr. Hopper, Holland, Riley, and Weir each time they pooled their money together because "[t]he entire four ounces was foreseeable relevant conduct" to Mr. Hopper.[101] The Government concedes that it failed to challenge the relevant conduct calcula-

---

[99] *See, e.g.*, *United States v. Garrett*, 528 F.3d 525, 530 (7th Cir. 2008) (holding that plain error in calculating the defendant's criminal history points, which resulted in a higher guidelines range, required resentencing because we had "no reason to believe" that the district court's error "did not affect its selection of the particular sentence").

[100] Appellee's Br. 49.

[101] *Id.* at 50; *see* U.S.S.G. § 1B1.3(a)(1)(B) (providing that, "in the case of a jointly undertaken criminal activity," a defendant's base offense level shall be determined based on "all acts and omissions of others" that were "(i) within the scope" of the conspiracy; "(ii) in furtherance of" the conspiracy; and "(iii) reasonably foreseeable in connection with" the conspiracy).

tion before the district court but explains that "it most likely would not have affected the advisory guideline range."[102]

We have recognized that "an appellate court can affirm the determination of a sentencing range 'on any ground supported by the record even if that ground was not relied upon by the district court.'" *United States v. Benitez*, 92 F.3d 528, 538 (7th Cir. 1996) (quoting *United States v. Rivera*, 6 F.3d 431, 447 (7th Cir. 1993)). But the Government has not offered, nor have we located, any authority to suggest that we can rely on a relevant conduct calculation not presented to the district court to affirm a defendant's sentence. Indeed, our decision in *United States v. Henderson*, 58 F.3d 1145 (7th Cir. 1995), suggests quite the opposite.

In that case, a jury found Henderson guilty of conspiracy to distribute cocaine base and distributing cocaine base. *Id.* at 1147. At sentencing, the district court attributed to Henderson the 18 grams of cocaine he was convicted of selling. *Id.* at 1151. The court also attributed ten percent of the amounts of cocaine described by Henderson's co-conspirator. *Id.* The court explained that it did not accept the full amount claimed by his co-conspirator because of "the 'vagueness and generalized' nature" of the co-conspirator's testimony "and the lack of money to support his contentions that he sold such large amounts of drugs." *Id.* Henderson challenged the amount of drugs the district court attributed to him, arguing that "by accepting only 10% of [the co-conspirator's] testimony, the court did not simply act conservatively, but instead indicated its belief that [the

---

[102] Appellee's Br. 50 n.6.

co-conspirator's] information was not sufficiently reliable to support any amounts above the 18 grams." *Id.* We agreed that the court clearly erred because it "did not have sufficient faith" in the co-conspirator's testimony "to use it as the basis for attributing further amounts to Henderson." *Id.* at 1152.

The Government submitted, however, that remand was not required because other calculations would result in drug amounts within the range applied by the district court. *Id.* For instance, the Government contended that we could calculate the drug quantity by multiplying the number of used plastic baggies by the amount of cocaine typically packaged in each baggie. *Id.* at 1153. Although we were "fairly certain that this calculation … would adequately sustain the court's determination," we declined to "embrace it ourselves." *Id.* We explained that "[t]he government first presented this calculation on appeal," such that "the district court, which has sentencing responsibility, [] had no opportunity to consider it." *Id.* The Government also proposed that we could determine the drug quantity based on the amount of money seized from Henderson and from a drug location on the day of his arrest. *Id.* We declined this suggestion, reasoning that "while the government introduced this evidence at trial, it did not present the calculations at sentencing." *Id.* Consequently, we left "the initial consideration of these sentencing issues to the district court on remand." *Id.*

For the same reasons, we decline to affirm Mr. Hopper's sentence based on relevant conduct calculations that the Government presented for the first time on appeal. Because neither party challenged the relevant conduct calculations below, "the district court, which has sentencing responsibil-

ity," *id.*, had no opportunity to consider any arguments regarding the proper calculation of Mr. Hopper's relevant conduct. The parties must present their drug quantity calculations to the district court to consider in the first instance on remand.

## Conclusion

For the foregoing reasons, we affirm Mr. Hopper's conviction for conspiracy to distribute methamphetamine and affirm the district court's determination that he was subject to a sentence enhancement for maintaining a residence for the purpose of distributing methamphetamine. We vacate his sentence and remand his case to the district court for resentencing based on our conclusion that there was plain error in the calculation of Mr. Hopper's relevant conduct.

AFFIRMED IN PART,

VACATED AND REMANDED IN PART